# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HECTOR AMAYA, *et al.*,

       *Plaintiffs*,

    v.

U.S. CUSTOMS AND BORDER PROTECTION, *et al*,

       *Defendants*.

Civil Action No. 1:22-cv-242

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................. i

Page.................................................................................................................................. i

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ................................................................................................1

BACKGROUND ...................................................................................................6

      A.     Blood Plasma Is Vital to Medical Treatment.......................................... 6

      B.     Plasma from Mexican Donors Is Critical to Public Health and to Plaintiffs .......... 8

      C.     CBP Has Long Allowed B-1/B-2 Visa Holders to Come Here to Donate Plasma11

      D.     CBP "Promulgated" the Plasma Ban Last Month Through a Press Release ....... 13

ARGUMENT .......................................................................................................15

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................. 15

      A.     Plaintiffs Are Within the Zone of Interest of the INA .......................... 15

      B.     The Plasma Ban Is Not in Accordance with Law ................................. 17

      C.     The Plasma Ban Is Arbitrary and Capricious ...................................... 23

      D.     CBP "Promulgated" the Plasma Ban Without Notice and Comment.................. 27

II.      THE PLASMA BAN WILL CAUSE IRREPARABLE HARM ABSENT RELIEF....... 29

      A.     The Plasma Ban Will Cause Irreparable Harm to Patient Plaintiffs and Public Health.................................................................................. 30

      B.     Employee Plaintiffs and Donor Plaintiffs Will Suffer Significant Unrecoverable Economic Harms..................................................................... 32

      C.     Plaintiffs Suffered Irreparable Harm to Their Notice-and-Comment Rights ....... 34

III.      THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF............ 35

CONCLUSION....................................................................................................37

CERTIFICATE OF SERVICE ...........................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Federation of Government Employees, AFL–CIO v. United States*,
   104 F.Supp.2d 58 (D.D.C.2000) ............................................................33

*Ancar v. Sara Plasma, Inc.*,
   964 F.2d 465 (5th Cir. 1992) ...............................................................17

*Ass'n of Flight Attendants-CWA v. Huerta*,
   785 F.3d 710 (D.C. Cir. 2015) ..............................................................28

*California v. Health & Human Servs.*,
   281 F. Supp. 3d 806 (N.D. Cal. 2017), *aff'd in part, vac'd in part on other
   grounds*, 911 F.3d 558 (9th Cir. 2018) .................................................34

*Matter of Camilleri*,
   17 I&N Dec. 441 (BIA 1980) ................................................................21

*Carabillo v. ULLICO Inc. Pension Plan & Tr.*,
   355 F. Supp. 2d 49 (D.D.C. 2004), *aff'd sub nom. Carabillo v. Ullico Inc*, 198
   F. App'x 1 (D.C. Cir. 2006)...........................................................32, 33

*Cardinal Health, Inc. v. Holder*,
   846 F. Supp. 2d 203 (D.D.C. 2012) .......................................................35

*Chamber of Commerce v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) ..............................................................32

*Children's Hosp. of the King's Daughters, Inc. v. Azar*,
   896 F.3d 615 (4th Cir. 2018) ...............................................................28

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000)...........................................................................22

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)...........................................................................23

*CSL Plasma Inc. v. United States Customs & Border Prot.*,
   No. 21-CV-02360 (TSC), 2021 WL 5869149 (D.D.C. Dec. 3, 2021)............................15, 16

*Delaware Dep't of Nat. Res. & Env't Control v. E.P.A.*,
   785 F.3d 1 (D.C. Cir. 2015) .................................................................26

*Dillmon v. Nat'l Transp. Safety Bd.*,
   588 F.3d 1085 (D.C. Cir. 2009) ............................................................23

*Dist. of Columbia v. Dep't of Agr.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................32

*Matter of Duckett*,
  19 I&N Dec. 493 (BIA 1987) ..............................................................................22

*E. Bay Sanctuary Covenant v. Trump*,
  349 F. Supp. 3d 838 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020) ........34

*Everglades Harvesting & Hauling, Inc. v. Scalia*,
  427 F. Supp. 3d 101 (D.D.C. 2019) ....................................................................32

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..........................................................................23, 25, 27

*Fischbein v. Olson Rsch. Grp., Inc.*,
  959 F.3d 559 (3d Cir. 2020)................................................................................28

*Fox v. Clinton*,
  684 F.3d 67 (D.C. Cir. 2012) ..............................................................................22

*Fund Democracy, LLC v. S.E.C.*,
  278 F.3d 21 (D.C. Cir. 2002) ..............................................................................34

*Greater Boston Television Corp. v. FCC*,
  444 F.2d 841 (D.C. Cir. 1970)............................................................................23

*Guilford Coll. v. McAleenan*,
  389 F. Supp. 3d 377 (M.D.N.C. 2019) ................................................................35

*Gunderson v. Hood*,
  268 F.3d 1149 (9th Cir. 2001) ............................................................................27

*Matter of Hira*,
  11 I&N Dec. 824 (BIA 1965 aff'd by A.G. in 1966)............................................21

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*,
  616 F. Supp. 1387 (N.D. Cal. 1985) ..................................................................20

*Iowa League of Cities v. E.P.A.*,
  711 F.3d 844 (8th Cir. 2013) ..............................................................................28

*Iowa Utilities Bd. v. FCC*,
  109 F.3d 418 (8th Cir. 1996) ..............................................................................32

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) ......................................................................15, 35

*United States ex rel. Krawitt v. Infosys Techs. Ltd., Inc.*,
   342 F. Supp. 3d 958 (N.D. Cal. 2018) ................................................................21

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .....................................................................29, 36

*Lee v. Christian Coalition of America*,
   160 F.Supp.2d 14 (D.D.C.2001) ..................................................................33

*Levorsen v. Octapharma Plasma, Inc.*,
   828 F.2d 1227 (10th Cir. 2016), 2015 WL 2148078 ...........................................20

*Levorsen v. Octapharma Plasma, Inc.*,
   828 F.3d 1227 (10th Cir. 2016) ..............................................................17, 19

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ...............................................................................16

*Matheis v. CSL Plasma Inc.*,
   936 F.3d 171 (3d Cir. 2019) .............................................................14, 17, 19

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014) ..............................................................28, 34

*Minney v. United States Off. of Pers. Mgmt.*,
   130 F. Supp. 3d 225 (D.D.C. 2015) ..............................................................29

*Mylan Labs., Inc. v. Leavitt*,
   484 F. Supp. 2d 109 (D.D.C. 2007) ..............................................................35

*N. Mariana Islands v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................34

*Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*,
   407 F. Supp. 3d 524 (D. Md. 2019) ..............................................................34

*Negusie v. Holder*,
   555 U.S. 511 (2009) ...............................................................................22

*Patel v. Quality Inn S.*,
   846 F.2d 700 (11th Cir. 1988) ..................................................................18

*Pennsylvania v. Trump*,
   281 F. Supp. 3d 553 (E.D. Pa. 2017), *rev'd on other grounds*, 816 F. App'x
   632 (3d Cir. 2020) ...............................................................................36

*Richmond Med. Ctr. for Women v. Gilmore*,
   11 F. Supp. 2d 795 (E.D. Va. 1998) ..............................................................29

*Risteen v. Youth For Understanding, Inc.*,
    245 F. Supp. 2d 1 (D.D.C. 2002) ......................................................29

*Scott v. CSL Plasma Inc.*,
    151 F. Supp. 3d 961 (D. Minn. 2015) .........................................17, 18

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ..........................................................15

*Silguero v. CSL Plasma Inc.*,
    907 F.3d 323 (5th Cir. 2018) .....................................................19, 20

*Steinhorst Assocs. v. Preston*,
    572 F. Supp. 2d 112 (D.D.C. 2008) ................................................29

*Tangney v. Burwell*,
    186 F. Supp. 3d 45 (D. Mass. 2016) ...............................................22

*Texas Children's Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) .............................................32, 35

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ....................................................32

*Wilson v. Grp. Hosp. & Med. Servs., Inc.*,
    791 F. Supp. 309 (D.D.C. 1992) .....................................................30

**Statutes**

5 U.S.C.
    § 553.............................................................................................27, 29
    § 702.................................................................................................16
    § 706(2)(A) .......................................................................................15
    § 706(2)(C) .......................................................................................15
    § 706(2)(D) .......................................................................................15

8 U.S.C.
    § 1101(a)(15)(B) ...................................................................8, 17, 18, 27

**Regulations**

8 C.F.R.
    § 235.1(h)(1) ......................................................................................8

21 C.F.R.
    § 606.121(c)(8)(v)(A) .......................................................................25
    § 640.65...............................................................................................7

22 C.F.R.
   § 41.31.................................................................................................................3, 28

**Other Authorities**

*Biotest sheds U.S. business to allay U.S. concerns of Chinese takeover*, Reuters
   (Jan. 29. 2018), https://www.reuters.com/article/us-biotest-m-a-creat/biotest-
   sheds-u-s-business-to-allay-u-s-concerns-of-chinese-takeover-
   idUSKBN1F82FC.......................................................................................................13

Business, *Black's Law Dictionary* (11th ed. 2019)..........................................................17

Catalina Navarro, *Pueden quitar visa en EU por vender plasma*, Tribuna de San
   Luis (Jan. 26, 2018) ..................................................................................................11

Centers for Disease Control and Prevention, *Data & Statistics on Hemophilia A*,
   https://www.cdc.gov/ncbddd/hemophilia/data.html .....................................................7

Commercial, *Black's Law Dictionary* (11th ed. 2019) ...................................................17

 "The Committee on Foreign Investment in the United States," Congressional
   Research Service (updated Feb. 14, 2020).................................................................12

Dep't of Homeland Security, Cyber Security and Infrastructure Security Agency,
   *Advisory Memorandum on Ensuring Critical Infrastructure Workers' Ability
   to Work During the COVID-19 Response* (Dec. 16, 2020)
   https://www.cisa.gov/sites/default/files/publications/ECIW_4.0_Guidance_on
   _Essential_Critical_Infrastructure_Workers_Final3_508_0.pdf ................................12

FDA, *Donate COVID-19 Plasma* (Oct. 10, 2020),
   https://www.fda.gov/emergency-preparedness-and-response/coronavirus-
   disease-2019-covid-19/donate-covid-19-plasma .......................................................12

Genco Op. No. 93-95, HQ 235-C, 1993 WL 1504042 (Dec. 28, 1993).........................22

George B. Schreiber et al., *Plasmavigilance—Adverse Events Among US Source
   Plasma Donors*, 2021 Transfusion 1 (July 19, 2021) ...................................................8

Jonathan M. Ciencewicki, *et al*., Plasma Donors in the Southwestern United
   States Positively Contribute to the Diverse Therapeutic Antibody Profile of
   Immune Globulin Products, Scientific Reports 10:6850 (2020),
   https://doi.org/10.1038/s41598-020-63794-y .............................................................9

KRGV (Dec. 23, 2019), https://www.krgv.com/news/cbp-confirms-plasma-
   contributions-could-jeopardize-travel-visas/; .............................................................24

Labor, *Black's Law Dictionary* (11th ed. 2019) ............................................................18

Letter from American Plasma Users Coalition to Mariela Farhi-Zimmerman,
    FAM Division Chief, U.S. Department of State (January 14, 2022)......................................30

Letter from Lynn H. Albizo, Vice President of Public Policy, Immune Deficiency
    Foundation, to Secretary Alejandro Mayorkas, Department of Homeland
    Security (June 29, 2021),
    https://primaryimmune.org/sites/default/files/IDF%20letter%20to%20Secretar
    y%
    20Mayorkas.pdf?fbclid=IwAR3Kxg8npDESAssJGdxNADTL7sSGF0gieFv8p
    WXh4kZpwOjH0wK3sSyD9aE .................................................................................3, 8, 9, 14

Nat'l Institute of Allergy and Infectious Diseases, *Primary Immune Deficiency
    Diseases*, https://www.niaid.nih.gov/diseases-conditions/primary-immune-
    deficiency-diseases-
    pidds#:~:text=There%20are%20more%20than%20200,chronic%2C%20debili
    tating%2C%20and%20costly .....................................................................................................7

Plasma Protein Therapeutics Ass'n, *10 Facts About Plasma Donation*,
    https://www.pptaglobal.org/images/Fact_Sheets/Redone/PPTA_Fact_Sheet_1
    0Facts_FINAL_rev2.pdf...........................................................................................................6

Plasma Protein Therapeutics Ass'n, *Find a Donor Center*,
    https://www.donatingplasma.org/ donation/find-a-donor-cente ................................................9

Work, *Black's Law Dictionary* (11th ed. 2019)...........................................................................18

## INTRODUCTION

Defendant U.S. Customs and Border Protection ("CBP"), under the supervision of Defendant Troy A. Miller, proclaimed, via a press release, that "[e]ffective immediately" foreign nationals with B-1/B-2 business and tourist visas will be denied entry to the United States if they are coming to donate their blood plasma at collection centers that provide payment to donors as part of the donation process. This "Plasma Ban," which reversed CBP's longstanding prior practice of allowing B-1/B-2 visa holders to enter the U.S. to donate plasma and receive payment, is based solely on CBP's newfound position that donating plasma somehow constitutes "labor for hire," an impermissible activity for B-1/B-2 visa holders. CBP's new policy will significantly reduce this country's supply of blood plasma, causing plasma collection centers in the southern border region, where the Employee Plaintiffs work and Donor Plaintiffs donate, to be shut down.[1] These closures will cause irreparable harm to employees who will lose their jobs as well as the donors who rely on the payments those centers provide. And, it will cause irreparable harm as well to those patients, including Patient Plaintiffs, relying on life-saving plasma-derived therapies. Plaintiffs seek a preliminary injunction to prevent these dire harms, especially when plasma is in great need, amid both high demand and short supply. Plaintiffs filed this motion only after industry representatives made repeated and persistent entreaties to decisionmakers across the relevant agencies and executive branch departments, as well as to decisionmakers in the legislative branch, which were

---

[1] Employee Plaintiffs work at border-region centers run by affiliates of CSL Behring and Grifols, companies that collect plasma and use it to develop therapies. The Donor Plaintiffs are Daniel Estrada and Kevin Rasmussen. Employee Plaintiffs are Hector Amaya, Alejandro Angulo, Edgar Felix, Trisha McCrimmon, and Robert Miranda. Hector Amaya and Robert Miranda are also Donor Plaintiffs. Patient Plaintiffs are those patients who rely on plasma-derived therapies to treat their conditions. The Patient Plaintiffs are John G. Boyle, William Hutsell and Megan Ryan. All these individuals together are referred to as "Plaintiffs." The legal fees of the individual plaintiffs are covered by CSL Behring and Grifols.

unsuccessful. This Court's prompt intervention is needed because CBP's new policy is both illegal and harmful to public health.

Human blood plasma is the critical ingredient necessary to produce essential life-saving treatments for serious diseases that affect more than 125,000 Americans, including primary and secondary immune deficiencies, respiratory diseases, neurological disorders, and hemophilia and other blood disorders. Efantis Decl. ¶ 2. Plasma-derived therapies are also used in cardiac surgery, burn treatment, and to prevent hemolytic disease of the newborn. Grifols is investigating the use of plasma to treat Alzheimer's, Parkinson's, and liver disease—pathologies that affect millions of Americans—and CSL Behring is investigating its use in areas of cardiovascular and transplant medicine.[2]

For over 30 years, CBP largely allowed B-1/B-2 visa holders from Mexico to enter this country for the purpose of donating their plasma at collection centers that provide a payment to donors. Cavanaugh Decl. ¶ 2; Procaccio Decl. ¶ 2. The Food and Drug Administration, too, has long been aware that Mexican national donors contribute significantly to U.S. plasma supply and has acquiesced in the practice. Rosa-Bray Decl. ¶¶ 3-8. While occasional public statements by CBP previously indicated that attempts to enter the U.S. to donate plasma would be subject to the "discretion" of border agents on a "case-by-case basis," as a practical matter B-1/B-2 visa holders have, until recently, been routinely allowed entry along most of the southern border to donate their plasma. Indeed, CBP has even *prioritized* plasma-donating B-1/B-2 visa holders over others: During the height of the COVID-19 pandemic, when B-1/B-2 visa holders were generally barred from entering the U.S. for virtually any purpose, Texas CBP officials coordinated with Employee

---

[2] "CSL Behring" here refers to CSL Behring and its affiliate, CSL Plasma Inc., which operates plasma collection centers. "Grifols" refers to the family of companies that operates plasma collection centers including Biomat USA, Inc., GCAM, Inc., and Talecris Plasma Resources, Inc.

Plaintiffs' employers to allow in those who were coming to donate their plasma. This policy aligned with the U.S. national pandemic strategy, developed by the Department of Homeland Security, which designated plasma donors as "essential" and plasma collection a "critical infrastructure industry." Those designations remain in effect today.

Based on CBP's longstanding prior practice, U.S. plasma supply has come to rely on donations from Mexican nationals entering this country on B-1/B-2 visas. Plasma donations from foreign nationals entering the United States on B-1/B-2 visas are responsible for 5-10% of the plasma collected in the U.S. and used to produce life-saving therapies.[3] The collection centers are intentionally located within the zone where holders of Border Crossing Cards (a form of B-1/B-2 visas available to Mexican nationals) are permitted to travel in the U.S.. Cavanaugh Decl. ¶¶ 3-4; Procaccio Decl. ¶¶ 3-4.

On or around June 15, 2021, without notice or an opportunity for dialogue, CBP needlessly pulled the rug out from under the plasma industry and patients who rely on plasma-derived therapies. In a statement to the press, CBP announced that "[e]ffective immediately," B-1/B-2 visa holders will no longer be allowed to enter the United States to donate plasma if they receive payment. Taking no account of economic disruptions that will upend plasma collection employees and donors alike or the glaring impact on the US plasma supply or even public health, and conspicuously ignoring decades of Mexican plasma donors being permitted to enter the U.S. with Border Crossing Cards and receive payment in connection with their donations, CBP asserted

---

[3] Letter from Lynn H. Albizo, Vice President of Public Policy, Immune Deficiency Foundation, to Secretary Alejandro Mayorkas, Department of Homeland Security (June 29, 2021) ("IDF Letter"), https://primaryimmune.org/sites/default/files/IDF%20letter%20to%20Secretary%20Mayorkas.pdf?fbclid=IwAR3Kxg8npDESAssJGdxNADTL7sSGF0gieFv8pWXh4kZpwOjH0wK3sSyD9aE.

for the first time that if a plasma donor receives payment, then their plasma donation constitutes "labor for hire," 22 C.F.R. § 41.31, an activity categorically prohibited by those here on B-1/B-2 visas.  CBP's policy is based solely on its newfound view that plasma donation constitutes "labor for hire."  At no point has CBP suggested any other justification for this abrupt shift in its policy and practice, including any suggestion that visas are being abused or that donors' entry presents pandemic-related or other health concerns.  As a result, CBP is turning away practically all Mexican nationals interested in donating plasma unless and until they procure a new visa, likely an H-type temporary work visa, that is, as a practical matter, impossible for any plasma donor to obtain.[4]

Notably, CBP's new position is flatly contrary to the position of the U.S. Department of Justice, which, in a Statement of Interest recently submitted to another federal court, called it "mistaken" to describe plasma donation as "akin to employment or contract work," even when the donor receives payment from the collection center, as occurs throughout U.S. plasma collection. The Justice Department has repeatedly expressed this view since at least 2015 in litigation brought under the Americans with Disabilities Act ("ADA").  According to the Department of Justice, a plasma collection center is a  "service establishment" and thus a place of public accommodation subject to Title III of the ADA because the collection center provides the service to donors of collecting their plasma.  The fact that the donor receives a payment associated with the donation is incidental to the service transaction and does not somehow transform the relationship into anything "akin to employment or contract work," the Justice Department has explained.  This view espoused by the Department of Justice cannot be reconciled with CBP's new assertion in the Plasma Ban that donating plasma at centers that provide payment constitutes "labor for hire."

---

[4] Temporary worker visas, for example, generally require a U.S. employer to first petition the government on behalf of the potential entrant.  Since Plaintiffs are not the employer of the plasma donor, the companies would not be in a position to file such a petition.

The notion that donating plasma and receiving payment amounts to "labor" or "labor for hire" is also legally incorrect.  And that legally incorrect interpretation will cause irreparable harm to Plaintiffs.  Plaintiff Employees work and Plaintiff Donors donate at border region donation centers that obtain a large percentage of their donations from Mexican nationals entering the US on B-1/B-2 visas.  CBP's Plasma Ban has halted those donations, causing an immediate and substantial drop in collections and, if not enjoined, the Plasma Ban will force companies like CSL Behring and Grifols to shut those centers down.

But the ultimate victims of the Plasma Ban are not only the donors and employees, but Plaintiff Patients and thousands of other patients, as plasma-derived therapies, already in tight supply, become even less available.  For example, the Plasma Ban could result in a substantial decrease in the manufacture of immunoglobulin, a critical therapy for those suffering from a variety of primary and secondary immune deficiencies—enough to affect thousands of patients—and for which no substitute therapy exists.  In conjunction with patient demand for immunoglobulin therapy increasing at a compound annual growth rate of 10 percent over the last decade and showing no sign of abating, an ongoing plasma shortage will have dire consequences for patients in need of this life-saving therapy.  Bensen-Kennedy Decl. ¶ 12.

CBP, in promulgating the Plasma Ban, appears to have ignored the impact on public health entirely.  It is Plaintiffs' understanding that high ranking officials at the Department of Health and Human Services (HHS) and at the Food and Drug Administration (FDA) were not consulted before the Plasma Ban was put in place, nor were they informed of the Plasma Ban after it had been implemented.

This government-inflicted harm to public health comes at a time when more plasma than ever is required to meet the growing need for plasma-based therapies, and comes on the heels of

the United States suffering a reported 20% industry-wide drop in plasma donations due to the COVID-19 pandemic.  Efantis Decl. ¶ 5.  Although companies like CSL Behring and Grifols have initiated targeted initiatives to increase collections outside of the Southern border region, they have only been partially successful in mitigating the plasma shortage.  Cavanaugh Decl. ¶ 5; Procaccio Decl. ¶ 5.

Because the Plasma Ban is contrary to the Immigration and Nationality Act (INA), fails even to acknowledge the longstanding prior practice of generally allowing B-1/B-2 visa holders to enter this country to donate their plasma (much less attempt to justify the change), was promulgated without notice and comment, and is inconsistent with existing regulations concerning appropriate activities by B-1/B-2 visa holders, Plaintiffs are likely to prevail in this challenge to the Plasma Ban under the Administrative Procedure Act.  And to prevent irreparable harm to Plaintiffs, this Court should preliminarily enjoin the Plasma Ban pending resolution of this case.

## BACKGROUND

### A.    Blood Plasma Is Vital to Medical Treatment

Human blood plasma is the essential ingredient in the preparation of therapies crucial to treating patients suffering from many life-threatening diseases and conditions, including immune deficiencies, hemophilia, shock or trauma, and other disorders.  Bensen-Kennedy ¶ 10.  In manufacturing treatments for certain conditions, such as immune deficiencies, no other substance currently is available to substitute for human blood plasma.  *Id.* ¶ 12.  Moreover, many therapies are so plasma-intensive that patients require vast quantities of plasma each year.  For instance, immunoglobulin therapy for one individual suffering from a host of primary and secondary immune deficiencies requires about 130 donations of plasma annually and a year of therapy for a single hemophilia patient requires plasma collected from about 1,200 plasma donations.  Bensen-Kennedy Decl. ¶ 3; *see also*, Plasma Protein Therapeutics Ass'n, *10 Facts About Plasma Donation*,

https://www.pptaglobal.org/images/Fact_Sheets/Redone/PPTA_Fact_Sheet_10Facts_FI-NAL_rev2.pdf.[5]  Global demand for plasma and plasma-derived therapies has steadily risen as medical practitioners throughout the world are becoming more familiar with various diseases such as the variety of immune deficiencies and as many countries' populations age.

Plasma is extracted from the human body through a process known as plasmapheresis, in which the donor's blood is drawn, the plasma is separated out, and the remainder (red cells and platelets) is returned to the donor.  Bensen-Kennedy Decl. ¶ 4.  Employee Plaintiffs manage the process of obtaining plasma from qualified donors—including Donor Plaintiffs—who visit the collection centers located in the border region of the United States or are themselves qualified donors who donate regularly.  *Id.*  The first donation usually takes about two-and-a-half hours, including a health assessment, and subsequent donations take about one to one-and-a-half hours. *Id.*

The collection of plasma is safe.  Plasmapheresis has been used in plasma collection for more than 50 years.  *Id.*  The practice is closely regulated by the U.S. Food and Drug Administration (FDA), and all donors must meet FDA eligibility requirements.  FDA regulations prescribe that a person may donate plasma no more two times within a seven-day period, with at least 48 hours between each donation.  *See* 21 C.F.R. § 640.65.  Due in part to this limitation, plasma

---

[5] Roughly 250,000 people in the United States are affected with primary immune deficiency diseases.  *See* Nat'l Institute of Allergy and Infectious Diseases, *Primary Immune Deficiency Diseases*, https://www.niaid.nih.gov/diseases-conditions/primary-immune-deficiency-diseases-pidds#:~:text=There%20are%20more%20than%20200,chronic%2C%20debilitating%2C%20and%20costly.  Hemophilia A, for instance, affects about 33,000 people in the United States.  *See* Centers for Disease Control and Prevention (CDC), *Data & Statistics on Hemophilia A*, https://www.cdc.gov/ncbddd/hemophilia/data.html.

donation "in the United States … is a safe process."[6]  Plasma donors throughout the United States routinely receive a payment in connection with donation—generally about $50.

### B.      Plasma from Mexican Donors Is Critical to Public Health and to Plaintiffs

Mexican nationals who enter the United States on B-1 and B-2 visas have been important contributors to the U.S. plasma supply for at least the past three decades. Cavanaugh Decl. ¶ 2. B-1 visas allow foreign nationals residing overseas to enter the U.S. "temporarily for business," and B-2 visas allow entry "temporarily for pleasure" (*e.g.*, tourism).  8 U.S.C. § 1101(a)(15)(B). For citizens of Mexico, the U.S. Government issues either a visa (which typically is issued as a B-1/B-2) or a so-called "Border Crossing Card," a form of B-1/B-2 visa that allows the cardholder to make temporary business trips ranging from 25 to 75 miles past the port of entry into the United States over the course of the Border Crossing Card's ten-year validity, without having to reapply for a separate B-1/B-2 visa for each trip.  *See* 8 C.F.R. § 235.1(h)(1) (permitted zone of entry is generally 25 miles past the port of entry in Texas, 55 miles in New Mexico, and 75 miles in Arizona).

Plasma donations by Mexican nationals on B-1/B-2 visas or Border Crossing Cards are essential to the U.S. plasma supply.  The impact of the loss of such donations is significant.  For example, plasma donations from foreign nationals entering the United States on B-1/B-2 visas are responsible for 5-10% of the plasma collected in the U.S. and used to produce life-saving therapies. *See* Cavanaugh Decl. ¶ 5; Procaccio Decl. ¶ 5.[7]  Such a disruption in plasma donations is especially

---

[6] George B. Schreiber et al., *Plasmavigilance—Adverse Events Among US Source Plasma Donors*, 2021 Transfusion 1, 11 (July 19, 2021).

[7] *See also* Letter from Lynn H. Albizo, Vice President of Public Policy, Immune Deficiency Foundation, to Secretary Alejandro Mayorkas, Department of Homeland Security (June 29, 2021) ("IDF Letter"), https://primaryimmune.org/sites/default/files/IDF%20letter%20to%20Secretary% 20Mayorkas.pdf?fbclid=IwAR3Kxg8npDESAssJGdxNADTL7sSGF0gieFv8pWXh4kZpwOjH0 wK3sSyD9aE.

critical now, when more plasma than ever is required to meet the growing need for plasma-based therapies, and when the United States is already suffering from a  20% industry-wide drop in plasma donations due to the COVID-19 pandemic. *See* Efantis Decl. ¶ 5.

Plaintiffs' employers have long relied on donations from Mexican nationals entering the U.S. on B-1/B-2 visas to donate their plasma.  *See* Cavanaugh Decl. ¶¶ 2-3; Procaccio Decl. ¶¶ 2-3.  Since 2013, in reliance on the continuing availability of Mexican donors, CSL Behring has opened or acquired 15 collection centers near the southern border in Texas and Arizona, each located specifically within the port-of-entry distance limitations allowed to Mexican nationals with Border Crossing Cards.  Cavanaugh Decl. ¶ 3.  Grifols has 24 centers located within the port-of-entry distance limitations in Texas, Arizona, and California.  Procaccio Decl. ¶ 3.

While border centers account for only 5% of plasma centers nationwide (52 of 1,001),[8] they account for 5-10% of plasma donations collected in the U.S.[9] Donations from the southern border region are critical to the US plasma supply for an additional reason: Plasma collected at centers near the Mexican border has been consistently shown to have higher levels of the antibodies that fight Hepatitis A than plasma collected elsewhere.  Bensen-Kennedy Decl. ¶ 18; Jonathan M. Ciencewicki, *et al*., Plasma Donors in the Southwestern United States Positively Contribute to the Diverse Therapeutic Antibody Profile of Immune Globulin Products, Scientific Reports 10:6850 (2020), available at https://doi.org/10.1038/s41598-020-63794-y.

In addition to serving a critical function to the US plasma supply, these centers provide Employee Plaintiffs and Donor Plaintiffs with vital financial benefits, either as a source of their employment, a place that pays them in connection with their donations, or both (for those who

---

[8] *See* Plasma Protein Therapeutics Ass'n, *Find a Donor Center*, https://www.donatingplasma.org/donation/find-a-donor-center.

[9] *See* IDF Letter, *supra* note 2.

work in a plasma center and also donate plasma).  Should these centers be shut down, which is the inevitable result of the Plasma Ban, Plaintiffs will suffer immense and irreparable harm.

For instance, Donor Plaintiffs Daniel Estrada and Kevin Rasmussen rely on payments from donations to take care of their families.  Mr. Rasmussen's wife suffers from a chronic condition, which has rendered her unable to work for months at a time.  During these periods, the additional funds that Mr. Rasmussen receives after donating plasmas are the only source of revenue that his family receives.  And the donation payments received by Mr. Estrada are critical as they serve as a safety net for his young family, covering those unpredictable expense that nevertheless are essential.

Employee Plaintiffs Hector Amaya, Alejandro Angulo, Edgar Felix, Trisha McCrimmon, and Robert Miranda all work at centers operated by either CSL Behring or Grifols in reliance on the continuing availability of Mexican national donors to frequent the border centers where they are employed, as such donors comprise a significant portion of donors at those and other border-region centers.  Should the Plasma Ban remain in effect these centers will be shut down and plasma collections will cease.  Indeed, employee hours at CSL Behring's facilities have been reduced by 40%. The Employee Plaintiffs will lose their jobs, and have no prospect of finding replacement employment, as each of these Employee Plaintiffs has spent the bulk of their professional careers in the plasma collection industry and do not have the requisite experience to find commensurate employment in other fields.  *See* Amaya Decl.; Angulo Decl.; Felix Decl.; McCrimmon Decl.; Miranda Decl. Donor Plaintiffs like Mr. Amaya (who donates plasma at the same center at which he is employed) and Mr. Miranda rely on these same centers to receive payments when they donate plasma as well.  Mr. Amaya donates as often as he can, receiving roughly $160 per week.  Amaya Decl. ¶ 3.  He relies on these funds to help cover basic, regular expenses like grocery bills and

clothing for his children.  *Id.*  Mr. Miranda donates irregularly to cover unpredictable expenses, mainly care repair expenses.  Miranda Decl. ¶ 2.

### C.    CBP Has Long Allowed B-1/B-2 Visa Holders to Come Here to Donate Plasma

CBP established a longstanding practice of generally allowing B-1/B-2 visa holders (primarily Mexican nationals with Border Crossing Cards) to enter the United States for the purpose of donating plasma at collection centers and receiving a payment in connection with the donation process.  Such payments are not new; they have existed since CBP first permitted Mexican nationals to enter the U.S. on B-1/B-2 visas to donate plasma decades ago, and  plasma collectors with locations near the southern border, like those belonging to Employee Plaintiffs' employers, provide such payments at both those locations and at all other collection centers located throughout the United States.  Wolsing Decl. ¶ 7; Cavanaugh Decl. ¶ 2; Mercado Decl. ¶ 4.  CBP border patrol agents in Texas have long been aware of such payments and have allowed B-1/B-2 visa holders to enter the U.S. to donate their plasma.  Mercado Decl. ¶¶ 2-7; Sanchez Decl ¶ 6.  In fact, CBP officials used to visit Grifols' collection center in Eagle Pass, Texas, demonstrating the collaborative relationship that governed before the Plasma Ban.  Sanchez Decl ¶ 6.  In Arizona, the situation has occasionally been more uncertain.  Before 2017, CBP officials in that state generally allowed donors to cross the border on B-1/B-2 visas like their colleagues in Texas.  Wolsing Decl. ¶ 7; Luna Decl. ¶¶ 3-4, ECF 7-9, *CSL Plasma v. CPB*, No. 1:21-cv-02360 (Sept. 7. 2021).  In March 2017, for instance, CBP officials in Arizona told representatives of CSL Behring that B-1/B-2 visa holders could donate plasma and receive payment.  Luna Decl. ¶¶ 3-4. But in 2018, Arizona officials at the port of entry at San Luis switched to a more ambiguous stance, unevenly and occasionally

barring donors from entry. *Id.* ¶¶ 5-8.[10] Enforcement of this more ambiguous stance was so uneven that Grifols was not even aware of it, receiving no reports of donors on B-1/B-2 visas having difficulty crossing the border into Arizona, Texas, or California until the inception of the pandemic in March of 2020.  Wolsing ¶ 7; Sanchez Decl. ¶ 7.  During the global shutdown occasioned by the COVID-19 pandemic in 2020, Texas CBP officials expressly allowed B-1/B-2 visa holders who intended to donate plasma to enter the United States, despite otherwise banning entry by other B-1/B-2 visa holders due to the pandemic.  Mercado Decl. ¶¶ 5-7; Sanchez Decl. ¶ 7.  And Texas CBP officials generally permitted Mexican nationals to enter the U.S. to donate plasma with full awareness of the payment they received. Mercado Decl, ¶ 4; Sanchez Decl. ¶ 6.  That practice by CBP continued—while the Mexican border remained largely closed—until issuance of the Plasma Ban on or around June 15, 2021. Mercado Decl, ¶ 8; Sanchez Decl. ¶ 8.

CBP's practice in Texas of allowing Mexican nationals to enter the U.S. to donate plasma aligned with the Department of Homeland Security's designation of plasma donors as "essential." Dep't of Homeland Security, Cyber Security and Infrastructure Security Agency, *Advisory Memorandum on Ensuring Critical Infrastructure Workers' Ability to Work During the COVID-19 Response* (Dec. 16, 2020) https://www.cisa.gov/sites/default/files/publications/ECIW_4.0_Guidance_on_Essential_Critical_Infrastructure_Workers_Final3_508_0.pdf; *see also* FDA, *Donate COVID-19 Plasma* (Oct. 10, 2020) (encouraging COVID-19 survivors to donate plasma), https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/donate-covid-19-plasma.  Indeed, the nation's supply of blood plasma is so essential that the Committee on Foreign Investment in the United States—an executive-branch body charged with

---

[10] *See also* Catalina Navarro, *Pueden quitar visa en EU por vender plasma*, Tribuna de San Luis (Jan. 26, 2018).

ensuring that vital U.S. interests are not compromised by foreign acquisition of domestic assets,[11] prevented a Chinese company from acquiring the U.S. operations of Biotest, a German blood plasma products maker. *Biotest sheds U.S. business to allay U.S. concerns of Chinese takeover*, Reuters (Jan. 29. 2018), available at https://www.reuters.com/article/us-biotest-m-a-creat/biotest-sheds-u-s-business-to-allay-u-s-concerns-of-chinese-takeover-idUSKBN1F82FC.  Biotest's U.S.-based plasma operations were considered too "sensitive" to "fall[] into Chinese hands."  *Id.*

### D.    CBP "Promulgated" the Plasma Ban Last Month Through a Press Release

On or around June 15, 2021, CBP reversed its longstanding practice with respect to B-1/B-2 visa holders, providing the following statement (the "Plasma Ban") to the press:

> Effective immediately, U.S. Customs and Border Protection advises that donation of plasma for compensation in the U.S. by B1/B2 non-immigrant visa holders is a violation of the terms of their visa and crossing the border for that express purpose will no longer be permitted under any circumstances.

> Selling plasma constitutes labor for hire in violation of B-1 non-immigrant status, as both the labor (the taking of the plasma) and accrual of profits would occur in the U.S., with no principal place of business in the foreign country.

> This does not affect the ability of non-immigrant visa holders to receive medical treatment in the U.S. or to make a true donation of blood, tissue or an organ without receiving compensation.

This Plasma Ban is premised solely on CBP's newfound view that "selling plasma constitutes labor for hire."  At no point has CBP suggested any other justification, such as abuse of the B-1/B-2 visa or pandemic-related health concerns.  Under the Plasma Ban, B-1/B-2 visa holders are no longer permitted to enter the United States to donate plasma if they receive payment, as occurs at the plasma collection centers operated near the southern border by Employee Plaintiffs' employers and other plasma collectors.

---

[11] *See generally,* "The Committee on Foreign Investment in the United States," Congressional Research Service (updated Feb. 14, 2020).

Immediately after the announcement of the Plasma Ban, Plaintiffs' employers reached out to executive-branch and legislative-branch decision makers.  Patient groups like the Immune Deficiency Foundation and the Guillan-Barre Syndrome/Chronic Inflammatory Demyelinating Polyneuropathy Foundation engaged in similar political advocacy, but were also unsuccessful.  *See* IDF Letter, *supra* note 2.  That political outreach failed to resolve the dispute, necessitating the filing of this action.

In the course of this outreach, Employee Plaintiffs' employers pointed out that CBP's new position is flatly contrary to the position of the U.S. Department of Justice, which, in a Statement of Interest submitted to the Northern District of Illinois just last month, called it "mistaken" to describe plasma donation as "akin to employment or contract work," even, as is done throughout US plasma collection, when the donor receives payment from the collection center.  Statement of Interest of the United States at 8, *Gomez v. CSL Plasma Inc.*, No. 20-cv-2488 (July 14, 2021) (ECF No. 50) ("*Gomez* SOI").  The Justice Department has repeatedly expressed this view since at least 2015 in litigation brought under Title III of the Americans with Disabilities Act (ADA).  According to the Department of Justice, a plasma collection center is a  "service establishment" and a place of public accommodation subject to Title III of the ADA because a plasma collection center "offer[s] a service to the public, the extracting of plasma for money, with the plasma then used by the center in its business of supplying a vital product to healthcare providers."  *Id.* at 6 (quoting *Matheis v. CSL Plasma Inc.*, 936 F.3d 171, 78 (3d Cir. 2019)).  The fact that the donor receives a payment associated with the donation is incidental to the service transaction and does not somehow transform the relationship into anything "akin to employment or contract work."  *See id.*  This view espoused by the Department of Justice cannot be reconciled with CBP's new assertion in the Plasma Ban that donating plasma at centers that provide payment constitutes "labor for hire."

14

Despite reversing the longstanding prior practice of generally allowing B-1/B-2 visa holders to enter this country to donate plasma, CBP did not conduct a notice-and-comment process (or anything even approaching it) before issuing the Plasma Ban.  Plaintiffs and other key stakeholders—such as patient groups in need of plasma-derived therapies, local leaders in the affected border towns, and other plasma collectors and therapeutic suppliers—were given no formal advance notice of the policy change, despite their significant reliance interests in the continuation of the longstanding prior practice.  CBP made no attempt to explain how its new policy was consistent with the Department of Justice's position.  And CBP did not provide any justification for this change.  Indeed, it denied that there had been a change at all.

## ARGUMENT

To obtain a preliminary injunction, a movant must show: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm absent relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 101 (D.C. Cir. 2021).  The third and fourth factors merge when the government is a party. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).  Here, all four factors strongly support the issuance of a preliminary injunction to prevent irreparable harm caused by the Plasma Ban.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The Plasma Ban is inconsistent with the governing statute, is arbitrary and capricious, and was improperly promulgated without notice or opportunity for stakeholders to comment.  The Plasma Ban thus violates the APA and should be set aside and vacated.  5 U.S.C. § 706(2)(A), (C), (D).

### A.     Plaintiffs Are Within the Zone of Interest of the INA

As a threshold matter, Plaintiffs may bring this action because they fall within the zone of interest of the INA.  Employee Plaintiffs' employers—affiliates of CSL Behring and Grifols—

brought an earlier case challenging the Plasma Ban which was dismissed without prejudice by the Court on the grounds that the companies did not fit within the zone of interest of the INA and so lacked "standing" to sue. *CSL Plasma Inc. v. United States Customs & Border Prot.*, No. 21-CV-02360 (TSC), 2021 WL 5869149, at *6 (D.D.C. Dec. 3, 2021) ("*CSL Plasma v. CBP*). The court found that the proper plaintiffs would be "workers affected by foreign labor," *id.* at *4, and that "the American workers potentially imperiled by CBP's revised guidance are Plaintiffs' own employees, who might lose their jobs if Plaintiffs reduce their blood plasma collections," *id.* at *5. The Court thus identified Employee Plaintiffs as the party "best positioned to vindicate the relevant interests" of the INA. *Id.* The Court also suggested that U.S.-based donors who, in a sense "compete" with Mexican donors, are also within the zone of interest. *Id.* at *4.

Donor Plaintiffs and Patient Plaintiffs are also within the zone of interest of the INA as described by the Court in *CSL Plasma v. CBP.* The Court found that CSL Behring and Grifols could not assert "third-party interests" of donors and patients. *Id.* But here, donors and patients appear to assert their own interests. There can be no question that border-region donors who will lose the ability to donate once their local collection center is shut down are "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Nor can it be denied that patients who will be forced to go without life-saving therapies will similarly be "adversely affected or aggrieved by" the Plasma Ban. 5 U.S.C. § 702. This conclusion is inescapable as "[a]ny doubt goes to the plaintiff," and the zone-of-interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress authorized that plaintiff to sue." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

16

**B.      The Plasma Ban Is Not in Accordance with Law**

The Plasma Ban conflicts with the text, structure, and purpose of the Immigration and Nationality Act (the "Act").  Section 101 of the Act provides that "an alien … other than one coming for the purpose of study or of performing skilled or unskilled labor … having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business" is not considered an "immigrant."  8 U.S.C. § 1101(a)(15)(B).  In its June 15, 2021 press release announcing the new Plasma Ban, CBP asserted that donating plasma constitutes "labor for hire" if the donor receives payment.  That is incorrect as a matter of law.

The Act distinguishes between a foreign national entering the U.S. "temporarily for business," who qualifies for a B-1 visa (a type of non-immigrant visa), as opposed to a person entering the U.S. to "perform[ ] skilled or unskilled labor," who does not qualify for a B-1 visa.  Entering the U.S. to donate plasma and receiving a payment constitutes international business activity, which qualifies for a B-1 visa, rather than domestic labor, which does not.  That conclusion flows from the straightforward meaning of the statutory terms "business" and "labor."  The word "business" carries a broad meaning—*i.e.*, "[c]ommercial transactions."  Business, *Black's Law Dictionary* (11th ed. 2019).  The word "commercial," in turn, means "[o]f, relating to, or involving the buying and selling of goods."  Commercial, *Black's Law Dictionary* (11th ed. 2019).  Under these capacious terms, the donation of plasma, accompanied by payment to the donor as part of the process, plainly constitutes a "commercial transaction," *i.e.*, "business."  *See, e.g.*, *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1234 (10th Cir. 2016) ("[Plasma donation centers] are place[s] of *business*." (emphasis added)); *Matheis v. CSL Plasma Inc.*, 936 F.3d 171, 178 (3d Cir. 2019) (similar); *Scott v. CSL Plasma Inc.*, 151 F. Supp. 3d 961, 965 (D. Minn. 2015) ("CSL does *business* with its plasma donors." (emphasis added)); *see also Ancar v. Sara Plasma, Inc.*, 964

17

F.2d 465, 469 (5th Cir. 1992) ("purchase price of plasma").  Consistent with the plain language of the statute, Mexican plasma donors are "visiting the United States temporarily for business."

The statute's structure supports this commonsense reading, as the general term "business" is juxtaposed with a specific exception: people "coming for the purpose of … performing skilled or unskilled labor" are not considered to be "visiting the United States temporarily for business." 8 U.S.C. § 1101(a)(15)(B).  This "definitional framework"—a broad term accompanied by specific examples—"strongly suggests that Congress intended an all encompassing definition" of the general term "business."  *Patel v. Quality Inn S.*, 846 F.2d 700, 702 (11th Cir. 1988).

Contrary to CBP's assertion in the Plasma Ban, the donation of human blood plasma cannot reasonably be considered "labor" or "labor for hire."  The word "labor" means to "work, esp. with great exertion."  Labor, *Black's Law Dictionary* (11th ed. 2019).  And the word "work" is defined as "[p]hysical and mental exertion to attain an end."  Work, *Black's Law Dictionary* (11th ed. 2019).  Neither one of these definitions encompasses the process of donating plasma, which involves no "work" or "exertion" on the part of the donor.  And the fact that donors receive payment in connection with the donation process does not alter this conclusion:  "[T]he fact that [CSL Plasma] technically pays donors for their time spent in the donation process, rather than for their plasma, does not change the fact that it pays them and receives, in exchange, plasma.  In this way, CSL is like a resale shop that purchases items from individuals to stock its inventory of merchandise, which the shop sells for profit."  *Scott v. CSL Plasma Inc.*, 151 F. Supp. 3d 961, 965 (D. Minn. 2015) (citation omitted).  In short, plasma donors are not performing anything that remotely resembles "labor."  Indeed, CBP, in making the determination that plasma donation is somehow tantamount to "labor for hire," is acting well outside of its area of expertise.

Importantly, the Department of Justice agrees with Plaintiffs on this dispositive point.  In a Statement of Interest recently filed in the Northern District of Illinois, the Department of Justice repeatedly and unequivocally called it "mistaken" to assert that the relationship between a plasma donor and a collection center is "akin to employment or contract work," asserting that plasma collection is unequivocally a *service* that the center provides *to the donor* under the plain meaning of the Act.  *Gomez* SOI, *supra*, at 8.  The Statement of Interest was filed on July 14, 2021, just one month after CBP's contrary assertion that plasma donation is "labor."

The *Gomez* case in which the Department of Justice filed the Statement of Interest involves the proper characterization of plasma collection centers, which in turn impacts whether such centers are subject to various provisions of the ADA.  The Third and Tenth Circuits have held that plasma collection centers are "service establishments" and thus constitute "public accommodations" subject to the anti-discrimination provisions under Title III of the ADA, while the Fifth Circuit held that they are not.  *See Matheis v. CSL Plasma Inc.*, 936 F.3d 171, 178 (3d Cir. 2019) (collection center is service establishment); *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1234 (10th Cir. 2016) (same); *Silguero v. CSL Plasma Inc.*, 907 F.3d 323, 328 (5th Cir. 2018) (collection center is not service establishment).  The Fifth Circuit held that collection centers are not service establishments (and therefore not public accommodations subject to the ADA) in part because donors receive payment as part of the process and therefore their donation is "more akin to employment or contract work."  *Silguero*, 907 F.3d at 330.

In its Statement of Interest, the Department of Justice asserted that the Fifth Circuit is "mistaken" in its view that plasma donors receiving payment are engaged in "employment or contract work" (*i.e.*, labor).  *Gomez* SOI, *supra*, at 8.  According to the Department of Justice, plasma collection centers are service establishments that provide the service of collecting plasma to the

19

donor, notwithstanding that the centers provide a payment to the donor.  The Department of Justice's Statement of Interest explains at length that it is not at all unusual for service establishments to make payments to their customers, citing as examples "banks, recycling centers, pawnshops, and consignment shops."  *Id.*  Because plasma donation is not an employment relationship but a service relationship, the inescapable conclusion, according to the Department of Justice, is that plasma collection centers are service establishments and so constitute public accommodations subject to the Title III anti-discrimination provisions of the ADA.  The Department of Justice has held this position since at least 2015, based on amicus curiae briefs filed in prior ADA matters raising the same question about plasma collection centers.  *See* Br. for U.S. as Amicus Curiae Supporting Neither Party, *Silguero v. CSL Plasma Inc.*, 907 F.3d 323 (5th Cir. 2018) (No. 17-41206), 2018 WL 889624; Br. for U.S. as Amicus Curiae Supporting Appellant and Urging Reversal, *Levorsen v. Octapharma Plasma, Inc.*, 828 F.2d 1227 (10th Cir. 2016) (No. 14-4162), 2015 WL 2148078.

The Department of Justice is right and CBP is wrong: plasma donation is not akin to employment or contract work, including when the collection center provides a payment to a donor as part of the donation process, and donation thus cannot be considered "labor for hire."

Furthermore, the Plasma Ban is fundamentally inconsistent with the purpose of the Act.  The key provision of the statute regarding B-1/B-2 visas is designed to protect "American workers from unnecessary foreign competition."  *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 616 F. Supp. 1387, 1401 (N.D. Cal. 1985).  But plasma donors are not performing "labor" and thus are not "workers," and Mexican nationals who choose to donate plasma are in no manner "competing" with "American workers" in doing so.  There is no zero sum game here, as allowing Mexican nationals to donate with B-1 Visas simply does not in any way impact the ability of U.S. citizens to donate plasma as well.  Instead, the Plasma Ban actually inflicts substantial harm on

American workers (such as those employed at border-region plasma collection centers) and creates substantial harm to public health by reducing the supply of plasma needed for life-saving healthcare therapies and medical research.  In any event, the Plasma Ban does not advance the Act's purpose in any respect.

Judicial precedent further refutes CBP's position that donating plasma constitutes imper-missible domestic labor rather than international business.  Courts have adopted the Board of Im-migration Appeals' construction of the Immigration and Nationality Act in *Matter of Hira*.  *See, e.g.*, *United States ex rel. Krawitt v. Infosys Techs. Ltd., Inc.*, 342 F. Supp. 3d 958, 965 (N.D. Cal. 2018) (citing *Matter of Hira*, 11 I&N Dec. 824 (BIA 1965 aff'd by A.G. in 1966)).  *Hira* identifies the following "significant considerations" in determining whether a person's conduct is an appro-priate B-1 international business activity as opposed to the performance of domestic labor in the U.S.:

1.  There is a clear intent on the part of the alien to continue the foreign residence and not to abandon the existing domicile;

2.  The principal place of business and the actual place of eventual accrual of profits, at least predominantly, remains in the foreign country;

3.  The business activity itself need not be temporary, and indeed may long continue; and

4.  The various entries into the United States made in the course thereof must be individ-ually or separately of a plainly temporary nature in keeping with the existence of the two preceding considerations.

Those factors, which CBP's Plasma Ban fails even to acknowledge, establish that B-1/B-2 visa holders are eligible to enter the U.S. to donate plasma under the statute.  Many Mexican plasma donors enter at a port of entry, donate plasma at a collection center conveniently located near the border, and return to Mexico all on the same day, thus showing a "clear intent on the part of the alien to continue the foreign residence" and the "plainly temporary nature" of the entry.  The "business activity itself" is the donation of plasma, which is plainly "temporary" as it takes just a

few hours.  And, because the donors are "based … overseas," their "principal place of business" under the second factor is considered to be overseas as well.  *See United States ex rel. Krawitt v. Infosys Techs. Ltd., Inc.*, 342 F. Supp. 3d 958, 965 (N.D. Cal. 2018) (applying *Hira*).

While Mexican plasma donors receive payment in the United States (and have done so for decades), this has never been considered a dispositive factor in favor of denying eligibility for B-1 visas under the *Hira* factors.  Indeed, in *Matter of Camilleri*, a Canadian truck driver who was paid in the United States was found to be eligible for a B-1 visa.  17 I&N Dec. 441 (BIA 1980); *see also Matter of Duckett*, 19 I&N Dec. 493 (BIA 1987) (allowing B-1 visa for foreign national whose "duties are performed on a regular and permanent basis at a fixed place of employment in the United States").

Similarly, a General Counsel opinion issued by CBP's predecessor agency addressed a highly analogous situation and again found that B-1 visas were appropriate.  Genco Op. No. 93-95, HQ 235-C, 1993 WL 1504042 (Dec. 28, 1993).  That Immigration and Naturalization Service opinion discussed Mexican couriers who would carry lab samples from Mexico to the U.S. and lab reports from the U.S. to Mexico.  *Id.*  The couriers were paid in the United States, just like plasma donors at issue here.  *Id.*  The General Counsel nevertheless opined that the couriers should be allowed to enter the U.S. on B-1 visas.  *Id.*  If anything, donating one's own blood plasma is even farther removed from "labor for hire" than the activities of the couriers addressed in the General Counsel opinion (delivering materials from one location to another).  *See also* 9 FAM 402.2-5(C)(4)(a)(U) (professional athletes are eligible for B-1 visas, even if competing for prize money which will be paid to them in the United States).

The BIA "is entitled to deference in interpreting ambiguous provisions of the INA," as it did in *Hari* and in opinions supporting its reasoning thereafter.  *See Negusie v. Holder*, 555 U.S.

511, 516 (2009).  CBP's Plasma Ban, promulgated through a press statement—constituting "little more than uncited, conclusory assertions of law in a short, informal document"—is not.  *Fox v. Clinton*, 684 F.3d 67, 78 (D.C. Cir. 2012); *see also Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *Tangney v. Burwell*, 186 F. Supp. 3d 45, 54 (D. Mass. 2016) ("This press release … does not receive *Chevron* deference.").

### C.     The Plasma Ban Is Arbitrary and Capricious

Aside from being inconsistent with the governing statute, the Plasma Ban is arbitrary and capricious.  Even when an agency "has acted within the scope of [its] statutory authority," section 706(2)(A) of the APA "requires a finding that the actual choice made was not arbitrary and capricious."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.*

When an agency changes course from a "prior policy [that] has engendered serious reliance interests," the agency must provide a "more detailed justification that would suffice for a new policy created on a blank slate."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that agency's decision was arbitrary and capricious because agency "provide[d] no significant justification for a *change* of policy" (emphasis in original)).  At the very least, this well-established standard "require[s] the agency to 'display awareness that it *is* changing position' and not to 'depart from a prior policy sub silentio or simply disregard rules that are still on the books.'"  *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (quoting *Fox Television Stations, Inc.*, 556 U.S. at 515 (emphasis by Supreme Court)).  And "where an agency departs from its precedent, it must do so by reasoned analysis."  *Id.* (internal quotation marks omitted); *see*

*also Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) ("[I]f an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.").  "This permits [a reviewing court] to ensure the agency's prior policies and standards are being deliberately changed, not casually ignored." *Dillmon*, 588 F.3d at 1089  (internal quotation marks omitted).  "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Fox Television Stations, Inc.*, 556 U.S. at 515

Here, the Plasma Ban reversed CBP's longstanding practice of allowing B-1/B-2 visa holders to enter the U.S. to donate plasma without even acknowledging the change.  Plasma collection centers have operated near the southern border in Texas, for example, for over three decades. Cavanaugh Decl. ¶ 2; Procaccio Decl. ¶ 2.  And, as stated above, during the height of the COVID-19 pandemic, CBP border patrol on the Texas border actively *prioritized* the entry of B-1/B-2 visa holders who intended to donate plasma at collection centers where Employee Plaintiffs work located within the zone allowed to holders of Border Crossing Cards, even as other B-1/B-2 visa holders were denied entry.  Mercado Decl. ¶¶ 5-7; Sanchez Decl. ¶ 7.  To the extent CBP ever publicly announced guidance on the issue officials claimed that the policy was to evaluate each attempted entry with "discretion" on a "case-by-case basis"—the opposite of the categorical prohibition set forth in the Plasma Ban.  *See*, *e.g.*, "CBP Confirms Plasma Contributions Could Jeopardize Travel Visas," KRGV (Dec. 23, 2019), https://www.krgv.com/news/cbp-confirms-plasma-contributions-could-jeopardize-travel-visas/; *see also id.* (quoting the State Department as expressly declining to opine on the legality of plasma donations by B-1/B-2 visa holders).

The practice of the U.S. Food and Drug Administration to inspect plasma centers further demonstrates the U.S. Government's policy of allowing Mexican nationals to donate plasma on B-

1/B-2 visas without concern as to payment.  FDA officials conduct routine audits of plasma col-lection centers, including those centers located at the border.  Rosa-Bray Decl. ¶ 7.  During the course of these audits, FDA officials are provided access to the addresses of individuals who have donated plasma at the location audited.  *Id.*  FDA officials would have seen a Mexican addresses when auditing a border center given that Mexican nationals comprise the majority of donors at most of the border centers.  *Id.*  FDA officials would have also been aware that donors receive a payment in connection with their donation, as that information is displayed prominently on the walls of the centers.  *Id.* ¶¶ 5-7.  FDA was therefore aware that Mexican nationals were donating plasma and receiving payment, and acquiesced in that practice.  *Id.*  ¶¶ 4-3, 8; *see also*, Mercado Decl. ¶ 9.  That agency has never objected to the practice, never advised Employee Plaintiffs' employers to stop the practice, never withheld or threatened to withhold a license as a result of collecting plasma from Mexican national and, to Plaintiffs' knowledge, never reported or threat-ened to report the issue to CBP.  Rosa-Bray Decl. ¶ 8.  Indeed,  paying a donor in connection with plasma donation is expressly contemplated by FDA as FDA regulation defines a "paid donor" as a person who receives monetary payment for a blood donation. *See* 21 C.F.R 606.121(c)(8)(v)(A).

CBP's longstanding prior practice of allowing B-1/B-2 visa holders to enter the U.S. to donate plasma at collection centers that provide payment "has engendered serious reliance interests that must be taken into account."  *Fox Television Stations, Inc.*, 556 U.S. at 515.  As described above, Employee Plaintiffs' employers, in reliance on the prior practice, has invested millions of dollars in establishing collection centers located conveniently to the U.S.-Mexico border and in advertising to Mexican nationals, and it continues to invest significant sums to maintain and grow such operations.  Cavanaugh Decl. ¶ 3; Procaccio Decl. ¶ 3.  Operations at these centers will be reduced dramatically should the Plasma Ban be allowed to remain in effect, negatively impacting

the corresponding local economies.  Cavanaugh Decl. ¶ 6; Procaccio Decl. ¶ 6.  Employee Plaintiffs' employers' efforts to compensate for these reductions have been only partially successful, despite determined initiatives to increase collections across their respective networks.  Cavanaugh Decl. ¶ 5; Procaccio Decl. ¶ 5.  What's more, Employee Plaintiffs' employers' supply chain was designed in reliance on the ability to collect plasma from border centers.  Cavanaugh Decl. ¶ 7; Procaccio Decl. ¶ 7.  Thus, the harm from the Plasma Ban is not limited to those local centers: Employee Plaintiffs' employers' manufacturing operation relies on as much plasma as it can collect to fulfill demand for their life-saving therapies. Cavanaugh Decl. ¶ 7; Procaccio Decl. ¶ 7.  In short, as a result of the CBP's failure to take into account these significant reliance interests, plasma collections will drop, employees will suffer and, most importantly, those dependent on life-saving plasma-derived therapies may no longer be able to rely on receiving them as prescribed.

Nor did CBP give any indication that it considered the impact of the Plasma Ban on patients and patient health.  For example, the Plasma Ban could cause disruption to the manufacture of life-saving therapies, or could cause patients to have to pay higher prices for their needed treatment. Efantis Decl. ¶ 8; Bensen-Kennedy Decl. ¶¶ 13-17.  Some may be able to obtain less efficacious non-plasma alternative treatments, but  some may have to go without any treatment at all.  Bensen-Kennedy Decl. ¶¶ 13-17.  CBP "should have, but did not, respond properly to [patients'] well-founded concerns."  *See Delaware Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1, 14 (D.C. Cir. 2015).  But CBP appears not even to be aware of any of these consequences of its Plasma Ban.

Indeed, industry advocates were advised that officials at FDA and HHS did not receive prior notice before CBP's adoption and implementation of the Plasma Ban.  Industry advocates were further advised about federal health officials' concerns over the Plasma Ban's negative impact

on the critically important system of plasma collections in the U.S., and concerns for the 125,000 patients who rely on plasma-derived therapies and could be significantly and adversely impacted. Efantis ¶¶ 19-25.

Worse, it appears that, to the extent CBP considered the health effects of the Plasma Ban at all, it did so only *after* the Ban had been put in place.  On July 20, 2021, well after the imposition of the Plasma Ban, the Plasma Protein Therapeutics Association received from Michael Millich, Supervisory Border Security Officer at CBP, asking  for information on such issues as "percentage of plasma donations believed to be provided by noncitizens coming to the U.S. in visitor status," "blood plasma levels in the U.S. overall and with confirmation of whether there is a shortage of supplies in the U.S.," and "percentage of blood plasma used for non-life-threatening treatments such as cosmetics."  Efantis Decl. ¶ 26.  These are important questions that CBP should have answered *before* dramatically damaging the nation's ability to collect blood plasma. (PPTA was unequipped to answer CBP's question about cosmetic use; the association's members collect plasma to make life-saving therapies.)

Because CBP did not acknowledge and explain the change in its position, because CBP did not acknowledge and explain the important reliance interests at stake, and because CBP did not acknowledge and explain the impact on public health, the Plasma Ban is arbitrary and capricious. *Fox Television Stations, Inc.*, 556 U.S. at 515.

### D.      CBP "Promulgated" the Plasma Ban Without Notice and Comment

Even had CBP acknowledged the change it was making (which it did not), and even had it provided the requisite justification for the change (which it also did not), the new policy would still be invalid.  The change, expressed through a press release, was required to be formally promulgated through notice and comment.  Because the Plasma Ban is inconsistent with existing regulations, it must be considered a legislative rule and is therefore invalid unless it was promulgated

according to the notice-and-comment procedures prescribed by 5 U.S.C. § 553. "If a rule is inconsistent with or amends an existing legislative rule, then it cannot be interpretive. Such a rule would impose new rights or obligations by changing an existing law and must follow the applicable procedures of the APA." *Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir. 2001) (footnote omitted).

The relevant existing regulation defines the term "business," as used in 8 U.S.C. 1101(a)(15)(B), to mean "conventions, conferences, consultations and other legitimate activities of a commercial or professional nature." 22 C.F.R. § 41.31. Under the regulation, "business" does "not include local employment or labor for hire" and payment associated with the applicable activity is not expressly addressed. *Id.* This regulation's definition of "business," in particular its catch-all phrase "legitimate activities of a commercial nature, underscores the invalidity of the Plasma Ban. Such broad language plainly encompasses donations of plasma with a payment. *See, e.g.*, *Fischbein v. Olson Rsch. Grp., Inc.*, 959 F.3d 559, 563 (3d Cir. 2020) (blood donation with payment is a "commercial transaction").

By categorically excluding plasma donation from the scope of "legitimate activities of a commercial nature" that are considered permissible "business" on a B-1 visa, the Plasma Ban is "irreconcilable" with 22 C.F.R. § 41.31. It effectively casts plasma donation, an essential business as determined by CISA, and an industry that is closely regulated by the FDA and other agencies, somehow not to be a legitimate activity of a commercial nature. And "if a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative." *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015).

Additionally, the Plasma Ban must be considered a legislative rule—and not mere inter-pretative guidance—because it "does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). The Plasma Ban "expand[s] the footprint of a regulation by imposing new requirements"—*i.e.*, the new requirement that B-1 visa holders may no longer do-nate plasma if they receive payment. *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) (citing *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 873 (8th Cir. 2013).

Legislative rules can only be promulgated in accordance with the notice-and-comment pro-cedures set forth at 5 U.S.C. § 553. *See, e.g.*, *Steinhorst Assocs. v. Preston*, 572 F. Supp. 2d 112, 120 (D.D.C. 2008). CBP did not come close to following notice-and-comment procedures, choos-ing instead to promulgate the Plasma Ban through a surprise statement to the press. The APA does not allow agencies to adopt legislative rules in such a slap-dash manner.

## II.    THE PLASMA BAN WILL CAUSE IRREPARABLE HARM ABSENT RELIEF

A preliminary injunction is warranted to prevent harm that is "actual and not theoretical," and that is "beyond remediation." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). Absent this Court's intervention, the Plasma Ban will cause such irreparable harm in three ways: (1) patients will suffer due to diminished access to plasma-based therapies, (2) Employee Plaintiffs and Donor Plaintiffs will suffer unrecoverable economic losses, and (3) all Plaintiffs will have been denied their right to provide comment on the Plasma Ban before it became effective.

A.      **The Plasma Ban Will Cause Irreparable Harm to Patient Plaintiffs and Public Health**

First and foremost, the Plasma Ban will irreparably harm patients by obstructing their access to plasma-based therapies prescribed by their doctors.  "[P]atients … suffer irreparable injury" when they "stand to be denied appropriate medical care either because physicians will choose not to treat them at all, or because the physicians will be forced to resort to less safe medical procedures which expose the patients to a greater degree of risk." *Richmond Med. Ctr. for Women v. Gilmore*, 11 F. Supp. 2d 795, 809 (E.D. Va. 1998); *see also, e.g.*, *Minney v. United States Off. of Pers. Mgmt.*, 130 F. Supp. 3d 225, 235 (D.D.C. 2015) (finding irreparable injury where a plaintiff lost medical benefits); *Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) (finding an irreparable injury where a loss of health coverage caused plaintiff to lose access to medical treatment); *Wilson v. Grp. Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 313-14 (D.D.C. 1992) (finding irreparable injury where a patient was threatened with loss of medical coverage).

For example, the Plasma Ban could result in reduced production of life-saving medicines treating primary and secondary immune deficiencies—enough to affect thousands of patients. Bensen-Kennedy Decl. ¶¶ 13-17.  Those patients may either have to pay a higher price for their medicine—due to a shortage of supply and increasing demand—or forgo treatment altogether. *Id.* ¶ 16.  *See also* Letter from American Plasma Users Coalition to Mariela Farhi-Zimmerman, FAM Division Chief, U.S. Department of State (January 14, 2022) ("substantial and irreparable harm to tens of thousands of patients who may not be able to access the therapies they need to treat their conditions" as a result of the Plasma Ban).  Indeed, globally there are 2,400 patients who now lack treatment as a result of the Plasma Ban.  *See* Joshua Penrod, Plasma Collection Challenges: COVID-19 and CBP at 9, Plasma Protein Therapeutics Association (Jan. 26, 2022) (Ex. A) ("PPTA Presentation").

High ranking government officials responsible for the public health have already admitted this.  As described above, HHS and FDA officials, in statements to industry advocates expressed concerns over the Plasma Ban's negative impact on the critically important system of plasma collections in the U.S..  *See* Efantis Decl. ¶  9-25.

Patient Plaintiff John G. Boyle relies on weekly treatments of plasma-derived therapies to survive.  Boyle Decl. ¶ 3.  The treatments combat his X-Linked Agammaglobulinemia, which makes it impossible for his body to generate the antibodies it needs to fight off everyday infections.  *Id.* ¶ 2.  Mr. Boyle has lived through plasma shortages before, and has bad memories of scrambling to secure a reliable supply of the treatments he needs to live. *Id.* ¶ 5.  He is deeply concerned that, this impending  shortage may leave him without the treatments he needs, and he will be forced to radically alter his quality of life with no assurance that he will survive absent sufficient plasma-derived therapies.  *Id.* ¶ 6

Similarly, Patient Plaintiff William Hutsell relies on therapies derived from donated human plasma to combat his common variable immune deficiency.  Hutsell Decl. ¶ 3.  Without weekly doses of immunoglobulin his immune system would be unable to fight off infections which may prove fatal.  If one of his weekly doses is delayed, even by just a few days, he would be forced to radically alter his lifestyle in order to avoid the likelihood of infection.  *Id.* at ¶  5.  And even with what would entail a substantial reduction of his quality of life, there is no guarantee that he could successfully avoid infection and potential death.  *Id.*  The prospect that his regular supply of immunoglobulin, a plasma-derived therapy, could be disrupted is profoundly concerning to him.  *Id.*

Finally, Patient Plaintiff Megan Ryan relies on weekly doses of immunoglobulin to combat her primary immunodeficiency.  Ryan Decl. ¶  4.  With the availability of weekly treatments, Ms. Ryan is able to lead an active, high quality lifestyle.  *Id.*  However, she is aware that the Plasma

31

Ban may well disrupt her ability to obtain these treatments, a prospect makes future treatment options uncertain and difficult to plan for her. *Id.*

### B.      Employee Plaintiffs and Donor Plaintiffs Will Suffer Significant Unrecoverable Economic Harms

Absent a preliminary injunction, Employee Plaintiffs and Donor Plaintiffs will suffer substantial unrecoverable economic losses as a result of the Plasma Ban.  Each of the Employee Plaintiffs have provided declarations stating that the border centers are their only source of income, from the salaries they earn working there and, for those who also choose to donate plasma when not working as an employee, from the payments associated with donating there.  If the Plasma Ban remains in force, these centers will be shut down, cutting all Employee and Donor Plaintiffs off from any such payments and resulting in dramatic economic injury. Indeed, CSL Behring centers have reduced hours by 40%. *See* Amaya Decl. ¶ 7; Angulo Decl. ¶ 6; Miranda Decl. ¶ 6.  Generally speaking, the Plasma Ban has already caused a reduction in payroll at border collection centers of $3.2 million. PPTA Presentation at 12 (Ex. A).

These economic injuries satisfy the requirement of irreparable harm because they are unrecoverable based on sovereign immunity.  "[W]here economic loss will be unrecoverable, such as in a case against a Government defendant where sovereign immunity will bar recovery, economic loss can be irreparable even if it would not wipe the business out." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020); (citing *Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 115 (D.D.C. 2019); *Dist. of Columbia v. Dep't of Agr.*, 444 F. Supp. 3d 1, 37 n.25 (D.D.C. 2020) (explaining that the "existential harm requirement" for economic losses is "inapplicable" to "unrecoverable economic harm"); *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242–44 (D.D.C. 2014); *see also*

*Chamber of Commerce v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm.").

Indeed, the economic harms from the Plasma Ban are such that they would support injunctive relief even if sovereign immunity were waived.  "[C]ourts in our Circuit have held that monetary loss may constitute 'irreparable injury' where the plaintiff … would be harmed in the interim by the loss of monetary benefits." *Carabillo v. ULLICO Inc. Pension Plan & Tr.*, 355 F. Supp. 2d 49, 55 (D.D.C. 2004), *aff'd sub nom. Carabillo v. Ullico Inc*, 198 F. App'x 1 (D.C. Cir. 2006) (citing *Lee v. Christian Coalition of America*, 160 F.Supp.2d 14, 31–32 (D.D.C.2001) (finding of "irreparable harm" where the plaintiffs were so poor that the loss of wages would result in insolvency, eviction, or difficulty in obtaining food); *American Federation of Government Employees, AFL–CIO v. United States*, 104 F.Supp.2d 58, 76 (D.D.C.2000) (finding of "irreparable harm" where one plaintiff sought relief from threatened termination and was the sole wage earner, supporting a disabled husband)).  Donor Plaintiffs have testified to this type of "interim harm."  *Id.* Mr. Rasmussen testified that, during periods of his wife's illness, his donor payments are the sole financial lifeline for his family.  Rasmussen Decl. ¶¶ 3-4.  Mr. Estrada and Mr. Miranda stated in their declarations that they rely on their ability to donate to cover car repair expenses, which come up often and yet are unpredictable.  Miranda Decl. ¶ 5; Estrada Decl. ¶¶ 3-4 . Without the ability to repair his car, Mr. Miranda would have no ability to take care of his large family of three boys and a girl.  *Id.*  Mr. Amaya donates as often as he is able, as he relies on the payments he receives from donating to cover his grocery bills and clothing for his children.  Amaya Decl. ¶ 6.  Employee Plaintiffs have also provided declarations supportive of this kind of harm.  Each has stated that,

absent income from the centers, he or she may lose their personal residence and may go homeless. *See Christian Coalition of America*, 160 F.Supp.2d at 31–32 (irreparable harm where eviction was contemplated). Each have testified that, absent this income they do not know how they would support their families. *See American Federation of Government Employees, AFL–CIO*, 104 F.Supp.2d at 76 (PI issued to when "sole wage earner" was threatened with termination). And each has testified that they do not know where they would find new employment to replace this lost income.

### C.      Plaintiffs Suffered Irreparable Harm to Their Notice-and-Comment Rights

It is well settled that an agency's violation of a procedural protection, like the right to notice and comment, causes a cognizable injury where "the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fund Democracy*, *LLC v. S.E.C.*, 278 F.3d 21, 27 (D.C. Cir. 2002). Affected parties thus are injured by the "[d]eprivation of a procedural right—in this case, the right … to submit comments on the [Plasma Ban] prior to its adoption." *Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*, 407 F. Supp. 3d 524, 533 (D. Md. 2019). Importantly, a plaintiff seeking to enforce a procedural right "need not demonstrate that but for the procedural violation the agency action would have been different.'" *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

Applying this long-settled standing principle to the context of preliminary injunctions, courts have held that the "depriv[ation] of the opportunity to offer comments" on a rule "may constitute irreparable injury while a rule promulgated in violation of [the APA] is in effect, provided that plaintiffs suffer some additional concrete harm as well." *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 865 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020). In other words, so long as a prospective commenter has an "immediate" interest "at stake," such as "fiscal interests" that are "ongoing," the "procedural injury" stemming from a notice-and-comment

violation "may serve as the basis for a finding of irreparable harm." *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 829 (N.D. Cal. 2017), *aff'd in part, vac'd in part on other grounds*, 911 F.3d 558 (9th Cir. 2018). At minimum, an affected party suffers irreparable harm where a rule improperly promulgated without notice and comment "will enact far-reaching changes that likely will have significant effects on" the plaintiff who was denied the opportunity to comment. *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009).

It would be an understatement to say that the Plasma Ban "will have significant effects" on Plaintiffs and the public health more generally. *Id.* As already detailed above, the Plasma Ban is likely to result in shortages of life-saving medicines and therapeutics, a happening that will have "significant effects" on the Patient Plaintiffs. Bensen-Kennedy Decl. ¶¶ 13-17. And globally, about 2,400 patients are already without life-saving treatment as a result of the Plasma Ban. PPTA Presentation at 10 (Ex. A). The curt language of the Plasma Ban fails even to acknowledge the harmful effects of the Ban on patients who rely on plasma-based therapies prescribed by their doctors. And, of course, the Plasma Ban will have devasting economic impact on Employee Plaintiffs' employers' border-region donation centers, along with the communities in which they are sited.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF

The final two factors in the analysis—the balance of equities and the public interest—"merge" where "the government is a party." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). Here, the equities and the public interest both powerfully support a preliminary injunction.

To begin with, a preliminary injunction will prevent irreparable harm to Plaintiffs, healthcare providers, and other companies that collect plasma donations for use in manufacturing plasma-based therapies. *See supra* Part II. There is "a robust public interest in safeguarding access to health care," *Texas Children's Hosp.*, 76 F. Supp. 3d at 246, and "in … patients obtaining needed

medications in a timely manner," *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 230 (D.D.C. 2012).  Protecting patients is unquestionably in the public interest.  And "[t]he public interest" favors "promoting industry incentives to research and develop new drug treatments." *Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109, 124 (D.D.C. 2007).  More generally, "there is a substantial public interest in having Defendants abide by the federal laws that govern their operations," including "the rule-making processes in the APA."  *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 395 (M.D.N.C. 2019) (cleaned up).  High ranking government officials from FDA and HHS—agencies charged with protecting public health—have already expressed their concern in this regard.  Efantis Decl. ¶¶ 19-25.

On the other side of the ledger, the government will suffer no harm from an injunction.  At worst, "[i]f Defendants ultimately prevail, then a preliminary injunction will have merely delayed their preferred regulatory outcome."  *Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 585 (E.D. Pa. 2017), *rev'd on other grounds*, 816 F. App'x 632 (3d Cir. 2020).  CBP has not even attempted to show that there is any pressing need to implement the Plasma Ban immediately.  Allowing the Plasma Ban to remain in effect will continue draining the nation's supply of plasma, while delaying it will allow the Plasma Ban instead to receive a considered evaluation.  And litigating this case to final judgment should not take long—the issues are legal in nature.  In the meantime, a preliminary injunction will "restore the status quo ante"—*i.e.*, CBP's longstanding prior practice of allowing B-1/B-2 visa holders (and those with Border Crossing Cards) to enter the U.S. to donate plasma regardless of whether they receive a payment for the inconvenience.  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 15 (D.C. Cir. 2016).  And the government cannot credibly claim that enjoining the Plasma Ban will cause it *any* harm, given its longstanding tolerance— indeed, encouragement—of B-1/B-2 visa holders donating plasma legally.

**CONCLUSION**

For the foregoing reasons, the Court should enter a preliminary injunction barring Defendants from implementing or enforcing the Plasma Ban pending resolution of this case.

DATED: January 31, 2022

Respectfully submitted,

*/s/ Baruch Weiss*
Baruch Weiss (D.C. Bar No. 388977)
R. Stanton Jones (D.C. Bar No. 987088)
Pari R. Mody (D.C. Bar No. 1032210)
Stephen K. Wirth (D.C. Bar No. 1034038)
John Swanson (D.C. Bar No. 1708630)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
Tel.: (202) 942-5000
Fax: (202) 942-5999

*Attorneys for Plaintiffs*

37

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on Defendants in accordance with Fed. R. Civ. P. 5. I further certify that a courtesy copy of this Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction and accompanying exhibits will be sent to the Court via third-party commercial carrier.

*/s/ Baruch Weiss*