**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HECTOR AMAYA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-242-TSC |
| | ) | |
| UNITED STATES CUSTOMS AND | ) | |
| BORDER PROTECTION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

ALEXANDER V. SVERDLOV
 (NY No. 4918793)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-8550
alexander.v.sverdlov@usdoj.gov

Dated:  February 11, 2022          *Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 4

I.      STATUTORY AND REGULATORY FRAMEWORK ........................... 4

II.     CBP'S PRACTICE AND THE JUNE 14, 2021 GUIDANCE ..................... 5

III.    PRIOR JUDICIAL PROCEEDINGS AND SUBSEQUENT
        DEVELOPMENTS................................................................................. 7

ARGUMENT........................................................................................................ 8

I.      PLAINTIFFS LACK STANDING ......................................................... 9

        A.      Plaintiffs' Alleged Injuries Are Not Traceable to CBP's Guidance............. 10

        B.      Plaintiffs Have Failed To Show That Their Alleged Injuries Are
                Redressable in This Action ................................................................. 14

II.     PLAINTIFFS' CHALLENGES TO CBP'S GUIDANCE FAIL ON THE
        MERITS................................................................................................ 16

        A.      The Guidance Is Consistent with the INA and Longstanding
                Interpretations of the B-1 Visa Classification.................................... 17

        B.      The Guidance is Neither Arbitrary Nor Capricious ..................................... 21

        C.      The Guidance Is, at Most, an Interpretative Rule that Did Not
                Require Notice or Public Comment ................................................... 25

III.    PLAINTIFFS FAIL TO SATISFY THE OTHER INJUNCTION FACTORS ........... 28

        A.      Plaintiffs Have Not Established Irreparable Harm....................................... 28

        B.      The Remaining Factors Weigh Against an Injunction.................................. 30

CONCLUSION.................................................................................................... 31

# TABLE OF AUTHORITIES

## CASES

*Allen v. Wright,*
  468 U.S. 737 (1984) ................................................................................................ 9, 13, 14

*Allina Health Servs. v. Sebelius,*
  756 F. Supp. 2d 61 (D.D.C. 2010) ............................................................................ 29

*Am. Mining Cong. v. Mine Safety & Health Admin.,*
  995 F.2d 1106 (D.C. Cir. 1993) ................................................................... 24, 25, 26

*Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agr.,*
  573 F.3d 815 (D.C. Cir. 2009) ..................................................................................... 8

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ..................................................................................... 11

*Bell Atl. Tel. Companies v. F.C.C.,*
  79 F.3d 1195 (D.C. Cir. 1996) .............................................................................. 22, 23

*Cardinal Health, Inc. v. Holder,*
  846 F. Supp. 2d 203 (D.D.C. 2012) .......................................................................... 28

*Catholic Health Initiatives v. Sebelius,*
  617 F.3d 490 (D.C. Cir. 2010) ................................................................................... 26

*Cent. Tex. Tel. Co-op., Inc. v. FCC,*
  402 F.3d 205 (D.C. Cir. 2005) ................................................................................... 25

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ................................................................................................... 13

*CSL Plasma Inc., et al. v. United States Customs & Border Prot.,*
  No. 21-CV-02360 (TSC), 2021 WL 5869149 (D.D.C. Dec. 3, 2021) ........................... *passim*

*Czyzewski v. Jevic Holding Corp.,*
  137 S. Ct. 973 (2017) ................................................................................................. 16

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
  140 S. Ct. 1891 (2020) ............................................................................................... 22

*Dillmon v. Nat'l Transp. Safety Bd.,*
  588 F.3d 1085 (D.C. Cir. 2009) ................................................................................. 23

*Exhaustless Inc. v. Fed. Aviation Admin.,*
    931 F.3d 1209 (D.C. Cir. 2019) ................................................................. 9

*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) ..................................................................... 9

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................................. 23

*Fogo de Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.,*
    769 F.3d 1127 (D.C. Cir. 2014) ............................................................... 22

*Gen. Motors Corp. v. Ruckelshaus,*
    742 F.2d 1561 (D.C. Cir. 1984) ............................................................... 25

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) ...................................................................... 28

*Grocery Mfrs. Ass'n v. E.P.A.,*
    693 F.3d 169 (D.C. Cir. 2012) ................................................................. 10

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese,*
    616 F. Supp. 1387 (N.D. Cal. 1985) ............................................... 4, 16, 20

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese,*
    761 F.2d 798 (D.C. Cir. 1985) ................................................................. 16

*Kelly v. Robinson,*
    479 U.S. 36 (1986) ................................................................................... 16

*Levorsen v. Octapharma Plasma, Inc.,*
    828 F.3d 1227 (10th Cir. 2016) ............................................................... 20

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................ 9, 10, 13

*Matheis v. CSL Plasma, Inc.,*
    936 F.3d 171 (3d Cir. 2019) .................................................................... 19

*Matter of Camilleri,*
    17 I. & N. Dec. 441 (BIA 1980) ......................................................... 16, 18

*Matter of Cote,*
    17 I. & N. Dec. 336 (BIA 1980) ............................................................... 16

*Matter of Duckett,*
    19 I. & N. Dec. 493 (BIA 1987) ................................................................................ 16, 18

*Matter of Hira,*
    11 I. & N. Dec. 824 (BIA 1966) ................................................................................ 16, 17

*Matter of Neill,*
    15 I. & N. Dec. 331 (BIA 1975) ...................................................................................... 16

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ............................................................................................ 8, 26, 27

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) ..................................................................................... 24

*Munaf v. Geren,*
    553 U.S. 674 (2008) ...................................................................................................... 8, 26

*Mwongera v. INS,*
    187 F.3d 323 (3d Cir. 1999) ..................................................................................... 16, 18

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan,*
    979 F.2d 227 (D.C. Cir. 1992) ....................................................................................... 24

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
    366 F.3d 930 (D.C. Cir. 2004), *abrogated on other grounds by,*
    *Perry Capital LLC v. Mnuchin,* 864 F.3d 591 (D.C. Cir. 2017) ............................ 9, 13, 14, 15

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................................ 29

*Open Society Institute v. U.S. Citizenship & Immigration Serv's.,*
    No. CV 19-3620, 2021 WL 4243403 (D.D.C. Sept. 17, 2021) ...................................... 22, 23

*Pai v. U.S. Citizenship and Immigration Services,*
    810 F. Supp. 2d 102 (D.D.C. 2011) ............................................................................... 16

*Perez v. Mortgage Bankers Ass'n,*
    135 S. Ct. 1199 (2015) .............................................................................................. 24, 25

*PGA Tour, Inc. v. Martin,*
    532 U.S. 661 (2001) ........................................................................................................ 20

*Physicians for Soc. Resp. v. Wheeler,*
    956 F.3d 634 (D.C. Cir. 2020) ....................................................................................... 22

*Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.,*
    489 F.3d 1267 (D.C. Cir. 2007)................................................................... 10, 14, 15

*Royal Siam Corp. v. Chertoff,*
    484 F.3d 139 (1st Cir. 2007)............................................................................... 22

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011)........................................................................ 8, 27

*Silguero v. CSL Plasma, Inc.,*
    907 F.3d 323 (5th Cir. 2018)............................................................................... 19

*Simon v. Eastern Kentucky Welfare Rights Org.,*
    426 U.S. 26 (1976).......................................................................................... 13, 14

*Steel Co. v. Citizens for a Better Env't.,*
    523 U.S. 83 (1998)............................................................................................ 8, 14

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009).......................................................................................... 8, 9

*U.S. ex rel. Cook v. Karnuth,*
    279 U.S. 231 (1929).............................................................................................. 16

*U.S. ex rel. Krawitt v. Infosys Techs. Ltd., Inc.,*
    342 F. Supp. 3d 958 (N.D. Cal. 2018) ................................................... 16, 18, 20

*Warth v. Seldin,*
    422 U.S. 490 (1975)............................................................................................. 14

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)............................................................................... 8, 26, 27, 29

*Wisconsin Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985)..................................................................... 27, 28

**STATUTES**

5 U.S.C. § 553 ................................................................................................. 24

8 U.S.C. § 1101 ........................................................................................... *passim*

8 U.S.C. § 1188 ................................................................................................. 24

8 U.S.C. § 1201 ................................................................................................... 5

42 U.S.C. § 12181 .................................................................................................... 19

**REGULATIONS**

8 C.F.R. § 214.2 ................................................................................................... 1, 4

22 C.F.R. § 41.25 .................................................................................................. 18

22 C.F.R. § 41.31 ........................................................................................... 1, 4, 16

**UNITED STATES CONSTITUTION**

U.S. Const. art. III, § 2 ........................................................................................... 8

**REGULATIONS**

9 FAM 402.2-5,
    https://fam.state.gov/FAM/09FAM/09FAM040202.html ...................................... 4, 18

9 FAM § 402.10-2 (2021),
    https://go.usa.gov/xtQtq ................................................................................ 17

CBP Confirms Plasma Contributions Could Jeopardize Travel Visas," KRGV
    (Dec. 23, 2019),
    https://www.krgv.com/news/cbp-confirms-plasma-contributions-could-
    jeopardize-travel-visas/ ................................................................................... 22

DHS, *DHS Releases Details for Fully Vaccinated, Non-Citizen Travelers to Enter the
    U.S. at Land and Ferry Border Crossings*, Oct. 29, 2021,
    https://www.dhs.gov/news/2021/10/29/dhs-releases-details-fully-
    vaccinated-non-citizen-travelers-enter-us-land-and-ferry ................................................. 7

DHS, *U.S. Nonimmigrant Admissions: 2019* (July 2020),
    https://www.dhs.gov/sites/default/files/publications/immigration-
    statistics/yearbook/2019/nonimmigrant_2019.pdf .................................................. 29, 30

INS General Counsel Op. No. 93-95, HQ 235-C,
    1993 WL 1504042 (1993) ................................................................................. 18

## INTRODUCTION

To facilitate international commerce and tourism into the United States, the Immigration and Nationality Act (INA) and its implementing regulations authorize what are known as B-1/B-2 visas, which permit holders to seek admission to the United States temporarily as visitors for business or pleasure. *See* 8 U.S.C. § 1101(a)(15)(B); 8 C.F.R. § 214.2(b); 22 C.F.R. § 41.31. Over the years, agencies have established extensive standards for what types of activities are permitted under a B-1/B-2 visa classification, which address circumstances ranging from operating a yacht to work in equestrian sports. Prior to 2021, however, no agency had put into writing a formal policy on the specific question of whether holders of such visas may be admitted to the United States to sell their blood plasma. Following the onset of the COVID-19 pandemic and the imposition of restrictions on non-essential travel at ports of entry along the U.S.-Mexico border, officials in U.S. Customs and Border Protection (CBP) headquarters learned that its individual CBP field offices were taking inconsistent positions on this issue. Accordingly, to bring uniformity to its officers' enforcement of the INA and Department of Homeland Security (DHS) regulations, CBP issued an internal guidance memorandum to its officers on June 14, 2021, clarifying that donation of plasma for compensation in the United States is not a permitted activity for B-1/B-2 visa nonimmigrants.[1] As CBP explained in its memorandum, selling plasma constitutes a form of purely local employment or labor, which is a category of activity that has long been impermissible under the INA's B-1/B-2 visa classification's provisions. *See* Decl. of Matthew Davies, Ex. 1 (Guidance).

---

[1] Plaintiffs repeatedly characterize the internal Guidance as a "statement to the press." Pls. Br. for Prelim. Inj., ECF 3-1 at 3. However, nowhere in their papers do Plaintiffs provide a link to the purported release of the Guidance in the press. *See generally id.*; Compl., ECF 1, ¶ 5.

Two plasma collection companies with facilities along the U.S.-Mexico border challenged CBP's Guidance in this Court last Fall, seeking a preliminary injunction against its enforcement. *See CSL Plasma Inc., et al. v. United States Customs & Border Prot.*, No. 21-CV-02360 (TSC), 2021 WL 5869149 (D.D.C. Dec. 3, 2021). The Court dismissed the action, holding that "the B-1/B-2 program is meant to protect the American worker," and the plasma companies' interests were too "coincidental" to come within the statutory zone of interest. *Id.* *5. The companies have appealed that judgment and that appeal is pending. *See CSL Plasma*, No. 21-CV-02360, ECF 32. In the meantime, however, the companies have paid for some of their employees and domestic donors[2] who regularly sell plasma at their centers—as well as several patients of plasma-derived therapies—to bring this related action, seeking the same relief. *See* Pls. Br. for Prelim. Inj., ECF 3-1 at 1 n.1 (Pls. Br.); Compl., ECF 1, ¶ 1. But these individual Plaintiffs in this repackaged, later-filed dispute are not entitled to an injunction either.

To begin, although the new plaintiff individuals appear to be among those the Court has previously identified as falling within the B-1/B-2 program's zone of interest, *CSL Plasma*, 2021 WL 5869149 *5, they fail to satisfy the basic Article III requirement of standing to maintain this lawsuit. In particular, Plaintiffs here have not established that their asserted injuries—namely, the diminution of pay allegedly suffered by the domestic donors and employees along with future uncertainty about drug supply resulting from the *plasma companies* curtailing their operations—is traceable to CBP's Guidance. Nor have Plaintiffs established that enjoining the Guidance is likely to redress those alleged injuries.

_____

[2] The two donors who are not also identified as employees are Mr. Kevin Rasmussen and Mr. Daniel Estrada. Compl. ¶¶ 17, 22. The complaint identifies them as "U.S.-based donors." *Id.* ¶ 82. There is no suggestion that either of them holds a B-1/B-2 visa or is in danger of being denied entry. *See* Compl. ¶¶ 17, 22.

Apart from this threshold defect, Plaintiffs' renewed and largely identical claims to those brought by the plasma companies also fall short on the merits. CBP's Guidance is fully consistent with the text and purpose of the INA, and with established interpretations of the statute by courts and administrative agencies. Because selling plasma is a domestic fee-for-services transaction that takes place entirely in the United States, it lacks a nexus to international commerce, which is a defining feature of permissible B-1 visa activity.[3]

Nor is CBP's Guidance arbitrary or capricious. Contrary to what Plaintiffs claim, CBP never had a formal policy of treating plasma donation for compensation as within the scope of permissible activity under the B-1 visa classification. In fact, the Guidance echoes public statements that CBP officials had made in prior years. But because of inconsistency in admission decisions across CBP's ports of entry, CBP headquarters issued the Guidance as an internal tool to assure uniformity in CBP's approach. The Guidance's reasoning and explanation are more than sufficient for this intended purpose. And because the Guidance was merely an internal memorandum interpreting existing legal requirements, CBP was not required to engage in notice or public comment before disseminating it to its employees.

The other preliminary-injunction factors likewise do not support Plaintiffs' requested relief. All of the allegedly irreparable harms Plaintiffs identify are the product of business decisions that have been made (or could, in the future be made) by the plasma companies. Specifically, those companies are in control of whether to maintain, curtail, or otherwise modify operations at their facilities, and have the ability to offset a drop in foreign donors by increasing the compensation they provide to incentivize increase

---

[3] Although Plaintiffs complain about CBP's criteria for admitting the combined category of B-1/B-2 visa holders, it is undisputed that the B-2 classification is not at issue in this case. That classification encompasses visits for pleasure, and Plaintiffs do not contend that selling plasma constitutes a pleasure activity. *See generally* Pls. Br. at 17-18.

donation by domestic plasma donors.  Plaintiffs' lack of specificity about the nature of those companies' business decisions—and the imminence of any particular centers' closure—doom their effort to show an irreparable injury that could be cured by the injunction they are seeking.  Nor have Plaintiffs shown that the balance of hardships and public interest tilt in their favor.

Accordingly, Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction, and their motion should be denied.

BACKGROUND

## I.  STATUTORY AND REGULATORY FRAMEWORK

Under the INA, a noncitizen seeking to enter the United States is categorized either as an "immigrant" or "nonimmigrant."  "In most instances, an immigrant seeks permanent residence, and a nonimmigrant seeks only a temporary stay." *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 616 F. Supp. 1387, 1390 (N.D. Cal. 1985).  Section 101(a)(15) of the INA sets forth 21 classes of noncitizens entitled to nonimmigrant status.  8 U.S.C. § 1101(a)(15).  At issue here is one such category, identified in § 1101(a)(15)(B):  "an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor . . . ) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily [1] for business or temporarily [2] for pleasure." *Id.* § 1101(a)(15)(B).

The U.S. Department of State, which is responsible for adjudicating visa applications, has promulgated regulations further elaborating on these statutory requirements.  22 C.F.R. § 41.31.  The pertinent part of the regulation, which has been in existence for more than thirty years, defines "business" as "refer[ring] to conventions, conferences, consultations and other legitimate activities of a commercial or professional nature," and "does not include local employment or labor for hire." *Id.*  Accordingly, "[a]n alien seeking to enter as a nonimmigrant for employment or labor pursuant to a contract or other prearrangement is required to qualify under" a different visa

4

classification. *Id.*; *see also* 8 C.F.R. § 214.2(b)(5) ("Aliens seeking to enter the country to perform building or construction work, whether on-site or in-plant, are not eligible for classification or admission as B–1 nonimmigrants under section 101(a)(15)(B) of the Act."). The State Department provides further guidance for what types of purposes may be deemed permissible B-1 visa activities in its Foreign Affairs Manual (FAM). *See* 9 FAM 402.2-5, available at https://fam.state.gov/FAM/09FAM/09FAM040202.html.

A noncitizen who demonstrates to the satisfaction of the State Department consular officer that he or she qualifies under the applicable criteria may be issued a B–1 visa and may use the visa to seek admission to the United States for the prescribed purpose. *See* 8 U.S.C. § 1201(a)(1)(B). Ascertaining whether the visa holder is admissible under the B-1 visa classification falls to CBP officers at the individual port of entry. *See* 8 U.S.C. § 1201(h); Davies Decl. ¶¶ 5, 7, 8. Those officers, who are generally responsible for ensuring that persons and goods entering the country comply with all applicable laws, conduct an examination at the time a person presents him or herself for entry. *Id.* ¶¶ 4, 5, 7, 8. Their judgments about whether a particular person satisfies the applicable criteria usually constitute the final determination of admissibility. *See id.* ¶ 8. However, their individualized decisions on a case-by-case basis do not define CBP's policies or priorities. *Id.* ¶ 6. Within CBP, those policies and priorities generally are established by the Office of Field Operations, which is responsible for overseeing the field offices and assuring uniformity in the agency's application of the laws at ports of entry nationwide. *Id.* ¶ 2, 6.

## II.    CBP'S PRACTICE AND THE JUNE 14, 2021 GUIDANCE

Consistent with the INA and applicable regulations, CBP has long taken the position that purely "local employment or labor for hire" in the United States is impermissible under the B-1 visa classification. Davies Decl. Ex. 2. "CBP has publicly stated that such activity may place an individual's" B-1/B-2 visa "in jeopardy of being cancelled since at least 2019." Davies Decl. ¶ 10; *see also* Pls. Br. at 22-23 (quoting newspaper articles on the issue). Indeed, there have been "cases prior to 2020" where

5

disclosure of an intent to sell plasma led CBP to take "adverse action with respect to [an] individual's visa." *Id.* However, these restrictions have proven challenging to enforce in practice, because CBP officers at ports of entry may not be able to always ascertain whether a person is entering to sell plasma if the person does not explicitly disclose that as a travel purpose. Davies Decl. ¶¶ 8-9.

This dynamic changed when DHS imposed restrictions on non-essential travel at land ports of entry along the U.S.-Mexico border following the onset of the COVID-19 pandemic in 2020. *Id.* ¶¶ 12-13. Many common B-1/B-2 visa purposes were deemed non-essential, *id.* ¶ 12, and CBP officers began to see more B-1/B-2 visa holders explicitly declaring plasma donation as their intended purpose for entry. Through CBP's internal channels, CBP's Office of Field Operations learned that some ports of entry—particularly those in Texas—were permitting B-1/B-2 visa "holders to enter the United States for the reported purpose of selling plasma at collection centers . . . while other ports of entry along the Southwest Border, including in Arizona and California, were deeming this activity to be impermissible under the terms of" a B-1/B-2 visa, and were turning such people away. *Id.* ¶ 13.

Following a comprehensive review, the Office of Field Operations issued the Guidance to the Directors of Field Operations, with instructions to "disseminat[e] to all ports of entry." Guidance at 1. The purpose of the Guidance was "to clarify how [CBP] officers should consider the intent to provide plasma during inspection." Davies Decl. ¶ 14; Guidance at 1.

The Guidance states that "CBP understands the role of the plasma donation business in cross border commerce, specifically along the U.S./Mexico border," but explains that while "[a] nonimmigrant visitor admitted in the B-1 or B-2 class of admission is permitted to *receive* medical treatment . . . . selling plasma would place the visitor in violation of their B nonimmigrant status." Guidance at 1 (emphasis added). Selling plasma, the Guidance details, "constitutes labor for hire in violation of B-1

nonimmigration status, as both the labor (the taking of the plasma) and accrual of profits would occur in the U.S., with no principal place of business in [a] foreign country." *Id.* "Additionally, because selling plasma does not constitute a legitimate activity of a recreational character, it is not a permissible B-2 activity." *Id.* The Guidance was effective upon issuance. *Id.*

## III.   PRIOR JUDICIAL PROCEEDINGS AND SUBSEQUENT DEVELOPMENTS

Three months after the Guidance's issuance, plasma collection companies CSL Behring L.L.C., CSL Plasma Inc. (collectively, CSL) and Biomat USA Inc. and its affiliates (collectively, Grifols) filed a lawsuit against CBP challenging the Guidance. *See generally CSL Plasma Inc., et al. v. U. S. Customs & Border Prot.*, No. 21-CV-02360 (TSC), 2021 WL 5869149. Arguing that the Guidance violated the APA, the companies sought a preliminary injunction against its enforcement. *Id.* Defendants opposed the motion arguing, among other things, that the plasma companies lacked a statutory cause of action because they were outside the statutory zone of interest. *Id.* This Court agreed. *Id.* Canvassing the statutory and regulatory framework of the INA, as well as court precedent addressing the B-1/B-2 visa provision, the Court concluded that the provision's "zone of interest is limited to those who seek to protect American laborers from competing with foreign laborers." *Id.* at *4. Finding that the plasma collection companies fell outside that category, the Court dismissed the case without prejudice. *Id.*

The companies have sought appellate review of that judgment. *See CSL Plasma*, No. 21-CV-02360, ECF 32. That appeal is currently proceeding on an expedited schedule, with briefing slated to be completed this month and oral argument to be held in March. *See CSL Plasma Inc., et al. v. U.S. Customs & Border Prot.* No. 21-5282, Doc. 1928442 (D.C. Cir., Dec. 28, 2021) (scheduling order). Not waiting for those proceedings to play out, the companies have financed a new group of plaintiffs to bring this related case. *See* Pls. Br. at 1, n.1. These Plaintiffs consist of (1) employees at the plasma companies' border facilities (the Employee Plaintiffs); (2) "U.S.-based donors" who do not hold B-1/B-2 visas

but sell their plasma at those facilities (the Donor Plaintiffs); and (3) patients who rely on plasma derived therapies (the Patient Plaintiffs).  Compl. ¶¶ 14-23, 82.  Plaintiffs raise the same substantive challenge to the CBP's Guidance as the companies did in their prior lawsuit, and seek the same relief.  *Compare* Pls. Br. at 15-29 *with CSL Plasma*, No. 21-CV-02360, ECF 7-1 at 14-27.

Notably, however, the circumstances at the border today are different than they were at the time the plasma companies brought their original action.  *See* Davies Decl. ¶¶ 16-17.  In November, 2021, CBP began to permit vaccinated travelers to enter for non-essential purposes.  *See id.* ¶ 16; DHS, *DHS Releases Details for Fully Vaccinated, Non-Citizen Travelers to Enter the U.S. at Land and Ferry Border Crossings*, Oct. 29, 2021, available at https://www.dhs.gov/news/2021/10/29/dhs-releases-details-for-fully-vaccinated-non-citizen-travelers-enter-us-land-and-ferry (last visited Nov. 4, 2021).  With that reopening, CBP has seen a surge of people seeking admission into the country.  *See* Davies Decl. ¶ 16.  Holders of valid B-1/B-2 visas are now being admitted for such declared purposes as tourism, shopping, and visiting relatives.  *See id*.  These monthly admissions now number in the millions.  *Id*.

## ARGUMENT

Plaintiffs are not entitled to the "extraordinary and drastic remedy" of a preliminary injunction.  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal citations and quotation marks omitted).  To obtain such an injunction, a plaintiff is required to show that:  "[1] [it] is likely to succeed on the merits . . . [2] [it] is likely to suffer irreparable harm in the absence of preliminary relief, . . . [3] the balance of equities tips in [its] favor, and . . . [4] an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  While the D.C. Circuit has in the past "allowed a strong showing on one factor [to] make up for a weaker showing on another," it has more recently "read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction."  *Sherley v.*

*Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (internal quotes and citation omitted)); *see also Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agr.*, 573 F.3d 815, 832 (D.C. Cir. 2009) (a "court need not proceed to review the other three preliminary injunction factors" where plaintiffs "show[] no likelihood of success on the merits").  Because Plaintiffs here have failed to establish either jurisdiction or a likelihood of success on the merits—and because the other factors do not favor relief either—they have failed to carry their "burden of persuasion," and their motion should be denied.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations and quotation marks omitted).

## I.     PLAINTIFFS LACK STANDING

Before considering the merits of a dispute or ordering any relief, federal courts must decide the "threshold" issue of their own jurisdiction.  *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 94-95 (1998).  Article III of the Constitution limits that jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2; *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).  And to come within that framework, Plaintiffs must allege facts establishing "the irreducible constitutional minimum of standing:" an injury-in-fact that is "fairly traceable to" the defendants' actions and that is "likely" to be "redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up, citations omitted).  Plaintiffs have failed to do so.

Although they repeatedly assert that they fear losing their jobs at the plasma centers or convenient locations to donate their plasma (and, in the case of the Patient Plaintiffs, potentially losing a steady access to needed drugs), Compl. ¶¶ 14-23, 82, Plaintiffs fail to establish that any of these asserted injuries, even if legally cognizable, is fairly traceable to the CBP Guidance they challenge, as opposed to the independent business decisions of the plasma centers that employ them.  Likewise, Plaintiffs fail to demonstrate that, given those independent business decisions, their asserted injuries would be redressed by the injunction they seek.

### A.    Plaintiffs' Alleged Injuries Are Not Traceable to CBP's Guidance

"Causation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party," are the source of Plaintiffs' alleged injury. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citing *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984) (other citations omitted)). If Plaintiffs are not themselves "the object of" an agency's action—and are instead contesting the agency's "regulation (or lack of regulation) of *someone else*"—they must clearly establish that their injury "does not result from the independent" decisions of those missing entities. *Exhaustless Inc. v. Fed. Aviation Admin.*, 931 F.3d 1209, 1212 (D.C. Cir. 2019) (quoting *Lujan*, 504 U.S. at 562) (emphasis in original, quotations omitted); *see also Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004) (requiring that "the record present[ ] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress"), *abrogated on other grounds by Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). To do so, Plaintiffs must do more than assert the necessary "causative link:" "even at the pleading stage, a party must make factual allegations showing" causation. *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007); *see also Lujan*, 504 U.S. at 562 (where standing hinges on independent choices of regulated third parties, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation").

Here, the domestic Donor and Employee Plaintiffs are removed from the CBP Guidance thrice over—and the Patient Plaintiffs, who rely on a whole pharmaceutical supply chain to manufacture their drugs, are removed even further still. *Lujan*, 504 U.S. at 562; *see* Compl. ¶¶ 14-23. None of the Plaintiffs claim to be B-1/B-2 visa holders who could be denied entry. *See* Compl. ¶¶ 14-23, 82; Pls. Br. at 8-10. And CBP's Guidance neither permits nor prohibits any action on the part of domestic donors or the plasma

centers that employ them.   Nor does the Guidance "*directly* impose regulatory restrictions, costs, or other burdens on" either the centers or the named Plaintiffs in this suit.   *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 175 (D.C. Cir. 2012) (emphasis added). Instead, the challenged guidance—which confirms that certain types of activities are impermissible under a B-1/B-2 visa—serves merely to guide CBP officers' enforcement with respect to unnamed *foreign nationals* who wish to donate plasma at the centers where the domestic Plaintiffs work.   *See* Davies Decl. ¶ 14; Guidance at 1.   All the injuries that Plaintiffs claim flow from the business decisions that these *plasma centers* have made (or may make in the future) in response to the decreased availability of those foreign nationals as a donation source.   *See, e.g.*, Compl. ¶¶ 14-23 (alleging that reduced operations of the plasma centers limits the opportunities for Employee Plaintiffs to work and for Donor Plaintiffs to donate, and makes Patient Plaintiffs fear for their "long-term" drug supply); *see also* Pls. Br. 8-10 (same).

In an effort to connect the agency's actions with their alleged injury, Plaintiffs repeatedly assert that while CBP's Guidance "remain[s] in force, the centers" employing them have reduced their operations and "will be shut down."  Compl. ¶¶ 78-79; *see also* Pls. Br. at 8-10.   But their complaint offers no elaboration on this assertion.   *See* Compl. ¶¶ 14-23, 78-79.   Nor do the declarations of CSL's and Grifols's senior corporate executives, on which Plaintiffs' allegation appears to be based.   *See* Cavanaugh Decl., ECF 3-14, ¶ 9 (stating simply that, "if the Plasma Ban continues in force [CSL Plasma] will likely be forced to shut down" four collection centers); Procaccio Decl., ECF 3-20, ¶ 9 (likewise asserting that, "if the Plasma Ban continues in effect, [Grifols] will be forced to close down" some centers).   Absent more detail, these executives' conclusory assertions— which are near word-for-word copies of each other—cannot manufacture causation.   *See, e.g.*, *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (courts "must take the complaint's allegations 'of facts, historical or otherwise demonstrable,' as true . . . [b]ut we treat 'allegations that are really predictions' differently" (internal citation omitted)).   The

executives do not offer so much as an estimate of how long the centers would continue to remain in operation under current circumstances, or when closures would take place. *See* Cavanaugh Decl., ECF 3-14, ¶¶ 6-9; Procaccio Decl., ECF 3-20, ¶¶ 6-9.

Even if these companies "have long relied on" availability of plasma from Mexican donors and built their operations around that model, Compl. ¶ 34, it does not automatically follow that closure of the centers is imminent or that CBP's Guidance would be the traceable cause. Indeed, the companies' executives admit that their business has been profoundly affected by the upheavals of the COVID-19 pandemic. *See, e.g.*, Proccaccio Decl., ECF 3-20, ¶ 5 (noting that, even before CBP's Guidance, plasma centers were "suffering from the realities of Covid-19, as there was already a shortage of plasma collections"); *see also* Wolsing Decl., ECF 3-19, ¶ 5-6 (noting that "the collection of plasma" in certain centers "dropped significantly" "[a]s a *result of the border closure due to Covid-19 in and around March 20, 2020*" (emphasis added)). Given all the ways that the pandemic has affected daily life and complicated the provision of medical services, the dearth of detail in the executives' declaration is fatal to Plaintiffs' efforts to establish a clear link between the plasma companies' analysis of whether to curtail operations at their centers and CBP's Guidance.

To the extent the companies need to collect more plasma to keep their centers open, *see* Procaccio Decl. ¶ 3, they have at least one obvious solution: increase the compensation it currently offers at those centers to attract more domestic (or other authorized) donors. *Cf.* Wolfsing Decl., ¶ 6 (noting that increasing "marketing" and "monetary reimbursement to donors" is a way to mitigate losses in donations). Such an increase would, notably, alleviate the financial harms that the domestic Donor and Employee Plaintiffs claim currently and increase the supply of plasma that the patient Plaintiffs claim to need. Alternatively, the companies could relocate their centers to areas where there are more domestic donors who would sell their plasma at the current rate. *See, e.g.*, Procaccio Decl. ¶ 8 (noting that other companies "rely less on border

collections"); Cavanaugh Decl. ¶ 8 (same).  That Grifols and CSL have chosen to, instead, reduce hours and staff time at their centers could be attributable to a host of factors, including a reluctance to recalibrate their profit models or make adjustments to wages that could reverberate beyond the particular centers along the border.  *Cf.* Procaccio Decl. ¶ 6 (noting that Grifols had been "moving employees" from the border clinics to other locations); Cavanaugh Decl. ¶ 6 (same).  These are quintessential business decisions that companies make based on their *sui generis* evaluation of the competitive environment and business uncertainty—which, no doubt, has been particularly acute with the repeated disruptions of the COVID-19 pandemic.  And neither the chief executive officer nor any of the other corporate executives who have furnished declarations in this matter offer any detail that would give the Court a basis to find that Grifols's and CSL's decisions to close centers and fire employees are either imminent or reflective of anything other than an independent exercise of business judgment.  *See* Cavanaugh Decl. ¶¶ 6-9;  Procaccio Decl. ¶ 6-9; *see also* Sanches Decl., ECF 3-18, ¶¶ 1-8; Wolsing Decl., ECF 3-19 ¶¶ 1-7.

Indeed, Plaintiffs' own materials confirm that attracting foreign donors is not an irreducible element of the business of collecting plasma, and that there are financially-viable alternatives.  *See, e.g.*, Procaccio Decl. ¶ 8 (stating that CBP's policy "may also cause Grifols to lose market share relative to some of its competitors who rely less on border collections"); Cavanaugh Decl. ¶ 8 (same).  This suggests that there is a great deal of discretion involved in the plasma centers choosing how to set their compensation and determining whether and where to stay open.  *See* Wolfsing Decl. ¶ 6 (noting that centers increased compensation in response to the pandemic); *see also* Cavanaugh Decl. ¶ 6 (noting that CSL is "working to retain jobs by moving employees to other collection centers").  But it is well established that, where a decision-maker is faced with many competing factors, the government's creation of financial incentives is not enough to establish causation.  *See, e.g., Allen*, 468 U.S. at 758–59 (causation was too speculative when parents of African American children challenged IRS' failure to enforce policy of denying

tax benefits to racially-discriminatory private schools); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) (causation was too speculative between hospital denials of services to the poor and an IRS policy granting favorable tax treatment to non-profit hospitals who offered only emergency room treatment to the poor).  So Plaintiffs would have to show more to connect CBP's Guidance with the economic injuries they allege.  *See generally Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.").

On the record Plaintiffs present, the plasma centers' business judgment about their continued operations, especially in light of the inherent upheaval brought on by the pandemic itself, cannot be taken as a direct consequence of CBP's Guidance and cannot be fairly attributed to it.  The Court cannot assume the existence of a jurisdictional element that Plaintiffs have not established.  *See, e.g.*, *Simon*, 426 U.S. at 38 (absent plaintiffs' proper showing of the standing elements, "exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation").

B.    **Plaintiffs Have Failed To Show That Their Alleged Injuries Are Redressable in This Action**

Separately, albeit for similar reasons, Plaintiffs also fail to establish that their injuries are redressable by the relief they seek in this lawsuit.  *Lujan*, 504 U.S. at 560-61. To establish redressability, Plaintiffs must offer more than "speculat[ion] that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff[s'] injuries."  *Nat'l Wrestling Coaches*, 366 F.3d at 938.  Rather, Plaintiffs must allege facts "sufficient to demonstrate a substantial likelihood that the third party directly injuring the [P]laintiff[s] would cease doing so as a result of the relief" the Plaintiffs seek.  *Renal Physicians*, 489 F.3d at 1275.  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."  *Citizens for a Better Env't*, 523 U.S. at 107; *see also Allen*,

468 U.S. at 758–59 (speculative whether change in tax exemption for private schools would lead to a change in school policies); *Simon*, 426 U.S. at 42–43 (speculative whether change in tax rules governing nonprofit hospitals would improve services for indigents); *cf. Warth v. Seldin*, 422 U.S. 490, 504 (1975) (plaintiffs claiming a local zoning ordinance excluded low income residents failed to show they would be able to buy or rent homes in the town if the court granted their requested remedy).

Here, for all of Plaintiffs' conclusory allegations that CBP's policy *may* cause plasma centers to close, Plaintiffs make *no* specific allegations about redressability.  *See* Compl. ¶¶ 78-83.  Plaintiffs identify no particular increase in donations that the centers need to increase operations and stay open—or how long they can continue to operate under current conditions.  *See* Procaccio Decl. ¶¶ 6-9; Cavanaugh Decl. ¶¶ 6-9.  Nor, for that matter, do they make any specific allegations to suggest that, given the general decrease in donations related to the COVID-19 pandemic, Mexican nationals would resume their prior rates of donations and the centers will choose to return to a status quo ante if CBP's policy is temporarily enjoined—which is not surprising, given that Plaintiffs identify no particulars about the centers' business model at all.  *See generally* Procaccio Decl. ¶¶ 6-9; Cavanaugh Decl. ¶¶ 6-9.  That is fatal.  *See, e.g.*, *Nat'l Wrestling Coaches*, 366 F.3d at 941 (requiring that "the record present[ ] *substantial evidence* . . . leaving little doubt as to causation and the likelihood of redress" (emphasis added)).

CBP's own experience since the reopening of the border suggests that there is significant reason to doubt that the conduct of third parties *would* significantly change were this Court to enjoin CBP's guidance.  As described in Mr. Davies' declaration, that reopening has caused an influx of people seeking to enter the country at the southern border.  *See* Davies Decl. ¶ 16.  Yet CBP has not seen a commensurate increase in the number of people declaring that they are traveling to sell their plasma, as they would be required to do upon questioning by a CBP officer if selling plasma were one of the purposes of their trip.  *See id.* ¶ 17.  And Plaintiffs have not even alleged, much less

established with "substantial evidence," *Nat'l Wrestling Coaches*, 366 F.3d at 941, that CBP's Guidance has chilled potential donors from seeking to enter the country.  *See generally* Compl. ¶¶ 14-23; Pls. Br. at 8-10.  The lack of any such proof is particularly problematic for Plaintiffs given that the country is still in the midst of a highly-contagious pandemic, when people are generally less willing to visit medical facilities where social distancing could be difficult—meaning that there could be a plethora of reasons, unrelated to the Guidance, for why donations at the plasma centers have been stagnant. Under these circumstances, Plaintiffs have to put forth specific allegations demonstrate that enjoining CBP's Guidance will lead to a restoration of the *status quo ante*.  *See, e.g.*, *Renal Physicians*, 489 F.3d at 1278 (noting that, even in instances where "governmental action is a substantial contributing factor in bringing about a specific harm," Plaintiffs will be unable to demonstrate redressability if "undoing of the governmental action will not undo the harm[] because the new status quo is held in place by other forces.").  This they have failed to do.

As the D.C. Circuit has repeatedly observed, redressability—and thus standing—is lacking where "the independent choice" of third parties "will hold in place the alleged" effect that Plaintiffs claim cause them injury.  *Renal Physicians*, 489 F.3d at 1278.  Because Plaintiffs have offered no basis for the Court to find redressability in this action, they have failed to properly invoke this Court's jurisdiction, and their requested injunction must be denied.

## II.    PLAINTIFFS' CHALLENGES TO CBP'S GUIDANCE FAIL ON THE MERITS

Even if Plaintiffs were to properly invoke this Court's jurisdiction, their arguments would fail on the merits.  Plaintiffs seek to characterize the Guidance as (1) contrary to the text and purpose of the INA; (2) an arbitrary departure from the government's prior positions; and (3) inconsistent with the APA's procedural requirements.  *See* Pls. Br. at 28-31. They are wrong on all counts.

16

A.   **The Guidance Is Consistent with the INA and Longstanding Interpretations of the B-1 Visa Classification**

Section 101 of the INA permits the admission of noncitizens "other than [those] coming for the purpose of . . . performing skilled or unskilled labor," who are "visiting the United States temporarily for business."  8 U.S.C. § 1101(a)(15)(B).  Plaintiffs claim that selling plasma is more in line with the ordinary meaning of "business" than it is with "labor"—and thus permissible under the B-1 visa classification.  Pls. Br. at 16-17 (citing dictionary definitions of both terms).  But such syllogisms are unavailing.

When "interpreting a statute, a court 'must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (quoting *Kelly v. Robinson*, 479 U.S. 36, 43 (1986)); *see also Bricklayers*, 616 F. Supp. at 1397 (in "testing the [guidance] against the [INA], the court's task is to interpret the [INA] in light of the purposes Congress sought to achieve in enacting it.").  As this Court correctly recognized in its prior decision, the "clear legislative history and subsequent interpretation of the B-1/B-2 program and its predecessors show that it has always been intended to limit the influx of foreign workers to 'protect[ ] American labor.'"  *CSL Plasma*, 2021 WL 5869149, at *4 (citing *Karnuth v. U.S. ex rel. Cook*, 279 U.S. 231, 243 (1929); *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 804 (D.C. Cir. 1985); *Pai v. U.S. Citizenship and Immigration Services*, 810 F. Supp. 2d 102, 110-11 (D.D.C. 2011)).  Consistent with this purpose, courts have repeatedly recognized that, to fall "within the proper scope of a B-1 visa," a noncitizen's commercial activities must be "'a necessary incident to international trade or commerce.'"  *Mwongera v. INS*, 187 F.3d 323, 328-29 (3d Cir. 1999) (citing *Matter of Duckett,* 19 I. & N. Dec. 493, 497 (BIA 1987); *Matter of Camilleri,* 17 I. & N. Dec. 441, 444 (BIA 1980); *Matter of Cote,* 17 I. & N. Dec. 336, 338 (BIA 1980); *Matter of Neill,* 15 I. & N. Dec. 331, 333 (BIA 1975)); *see also Matter of Hira*, 11 I. & N. Dec. 824, 827 (BIA 1966) (citing *Karnuth*, 279 U.S. at 244); *U.S. ex rel. Krawitt v. Infosys Techs. Ltd., Inc.,*

342 F. Supp. 3d 958, 965 (N.D. Cal. 2018) (noting that the State Department's "FAM praises *Matter of Hira* as still providing '[t]he clearest legal definition' of what constitutes business activity").   Purely "local employment" in the United States—whatever its character—does not satisfy this standard.   *See Mwongera*, 187 F.3d at 329; *see also* 22 C.F.R. § 41.31(b); *Neill*, 15 I. & N. Dec. at 333 (holding that B-1 classification does not permit "performing personal services in the United States [for remuneration] independent of any other commercial activity" that is incident to international trade).[4]

Plaintiffs do not contest this established framework.   To the contrary, they affirmatively embrace the factors *Matter of Hira* prescribes for determining whether a business activity is permissible.   Pls. Br. at 21.   But a proper application of the framework defeats their arguments for why selling plasma should be considered a permissible B-1 visa activity.   As the Guidance correctly concludes, there is no international nexus to the transaction:   "[B]oth the labor (the taking of the plasma) and accrual of profits [] occur in the U.S."   Guidance at 1.   There is no "principal place of business" abroad.   *Id.*   Contrary to Plaintiffs' suggestion, Pls. Br. at 22, the transaction does not take on an international character merely because some people selling plasma are foreign nationals.   The plasma donors are not themselves a "business" as that term is understood in this context, and they are not entering the country as part of their employment with a foreign company.   If the presence of a foreign worker were enough to transform a purely domestic transaction into an international business, any "local employment" of a foreign national would qualify for the B-1 "business" purpose, robbing the international-nexus requirement of all meaning.

---

[4] Notably, Congress has spoken clearly when it intends to address the domestic work of noncitizens in the United States.   Section 1101(a)(15)(H), for example, created a visa category for nonimmigrant temporary workers in specialty occupations, agricultural work, and certain other enumerated fields.   8 U.S.C. § 1101(a)(15)(H); *see* 9 Foreign Affairs Manual § 402.10-2 (2021), https://go.usa.gov/xtQtq (addressing H visas).   The absence of any such provisions in the B-1 visa classification indicates the Congress did not intend that category to cover purely domestic work.

Indeed, the collection of plasma from foreign nationals stands in stark contrast to the other instances of permissible "business" activity that Plaintiffs cite in their brief. *See* Pls. Br. at 21–23. *Matter of Hira* concerned a Hong Kong company that sent a tailor to the United States to take customers' measurements for suits being made in Hong Kong. 11 I. & N. Dec. 824. Similarly, *Krawit* concerned an Indian corporation that sent its employees to run training sessions for an American company. *See* 342 F. Supp. 3d at 960, 964–65. And while the BIA has found that Canadian truck drivers transporting goods across the border between the United States and Canada were engaged in permissible B-1-visa activity, it did so on the ground that those drivers were "employees of common carriers who are engaged in international trade or commerce." *Camilleri*, 17 I. & N. Dec. at 443; *see also Duckett*, 19 I. & N. Dec. at 498 (railroad clerk's role was "necessary incident to international trade" because he was "engaged in the transportation of goods across the international boundary"); INS General Counsel Op. No. 93-95, HQ 235-C, 1993 WL 1504042 (1993) (noting that B-1 nonimmigrants can transport goods across borders *but not* between points within the United States).

Unlike in all those cases, here there is no foreign company that is sending its workers to the United States as part of its international business; nor are the foreign nationals crossing the border being employed by a common carrier and "simply delivering goods internationally," *Mwongera*, 187 F.3d at 329. Under these circumstances, the Guidance correctly concludes that crossing the border to sell plasma is a form of purely domestic labor that does not constitute a permissible "business" for the purposes of a B-1 visa.

This conclusion is fully consistent not only with State Department regulations, which define "business" for purposes of a B-1 visa to exclude "purely local employment," 22 C.F.R. § 41.25(b), but also with the FAM, which includes detailed examples for permissible B-1 visa activities. The examples the FAM provides for "business" activities include "[n]egotiat[ing] contracts," "[c]onsult[ing] with business associates,"

"[p]articipat[ing] in scientific, educational, professional, or business conventions," and participating in "a competition for which there is no remuneration other than a prize." FAM 402.2-5(B), (C), (G). Selling plasma, where both the activity and the monetary compensation occur entirely within the United States, is not akin to any of those international business activities, nor is it similar to "professional athletes . . . competing for prize money." Pls. Br. at 21 (citing 9 FAM 402.2-5(C)(4)(a)(U)).

As a separate line of argument, Plaintiffs claim that the Guidance is at odds with the position taken by the United States in litigation concerning the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181. *See Gomez v. CSL Plasma Inc.*, No. 20-cv-2488, ECF No. 50 (July 14, 2021) (*Gomez* SOI). There, and before other courts, the United States has argued that plasma donation centers are "service establishments" *for purposes of the ADA. See id.* at 4, 8. This question of whether plasma donation centers are "service establishments" under the ADA has divided three circuits. *See, e.g., Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 177 (3d Cir. 2019) (holding that plasma centers are service establishments); *Silguero v. CSL Plasma, Inc.*, 907 F.3d 323, 330 (5th Cir. 2018) (holding that plasma centers are not service establishments and finding that the relationship between plasma donation centers and donors is "more akin to employment or contract work"). But cases about the meaning of "service establishment" under the ADA—and the United States' position in those cases—have no bearing on the question at issue here. The ADA and the INA are different statutes, with starkly different structures and purposes. Definitions given to terms in the ADA simply do not govern the definitions given to terms in the INA.

Among other things, as the United States explained in its statement of interest in the *Gomez* case, whether the plasma center provides its donors compensation "has no bearing on whether [that] establishment provides a 'service'" within the meaning of the ADA. *Gomez* SOI at 8 (noting that "[m]ost service establishments receive compensation from their customers, but some, such as banks, recycling centers . . . [etc.] compensate

their customers"); *see also* 42 U.S.C. § 12181(7)(F) (identifying types of "service establishments"). Rather, what matters is whether an "establishment assists members of the public by offering the benefit of expertise or specialized equipment or both." *Id.* This expansive definition of "service establishment" under the ADA is consistent with the statute's legislative history, and the Supreme Court's instruction that the ADA "should be construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676–77 (2001) (internal quotes and citation omitted); *see also Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1233 (10th Cir. 2016) (concluding that, given the ADA's legislative history, blood plasma centers should fall within the statute's expansive definition of service establishment). By contrast, the question of who is providing compensation *is* highly relevant to the analysis of whether someone is engaged in purely local employment for purposes of the INA. *See, e.g.*, *Krawitz*, 342 F. Supp. 3d at 964-65. And reading the ADA "liberally" to accomplish its statutory purpose in no way compels the conclusion that plasma centers, which provide compensation to their donors, cannot be deemed to employ those donors within the meaning of the INA. To the contrary, as noted above, the latter conclusion is fully consistent with Congress's intent that the INA protect American labor in the face of foreign competition. *See, e.g.*, *Bricklayers*, 616 F. Supp. at 1396.

Because CBP's Guidance is fully consistent with the INA, Plaintiffs' challenge to the Guidance on this ground has no likelihood of succeeding on the merits.

### B.   The Guidance is Neither Arbitrary Nor Capricious

Plaintiffs' attempts to cast the Guidance as arbitrary or capricious fare no better. Plaintiffs' principal charge on this ground is that the Guidance "reversed CBP's longstanding practice" of admitting B-1 visa holders for the purpose of selling plasma without appropriate justification. Pls. Br. at 23-24. Not so.

As explained in the attached declaration of Matthew Davies, CBP never had a formal policy that selling plasma was an appropriate B-1 visa activity. Davies Decl. ¶ 10 (explaining that CBP headquarters "has never taken a position that, on a programmatic basis, selling plasma for compensation would be permissible under the B-1 or B-2 classification"). And Plaintiffs do not allege otherwise. *See generally* Compl. ¶ 1, 4-9. To the contrary, since at least 2019, "CBP has publicly stated that such activity may place an individual's visa or [border crossing card] in jeopardy of being cancelled." Davies Decl. ¶ 10. However, the issue was not a particular focus for CBP headquarters, nor was CBP headquarters aware of a lack of uniformity on the issue across the ports of entry. *Id.* ¶¶ 9-11. Prior to the restrictions on non-essential travel at land ports of entry due to COVID-19 concerns, Mexican nationals presenting themselves for admission would not necessarily have announced that they were crossing the border to donate plasma (despite being required to do upon questioning so if that were their intent), *id.* ¶ 10, which would have made it more difficult for CBP officers to ascertain this impermissible purpose and to distinguish it from any stated legitimate activity under the B-1/B-2 visa classification, such as entry to visit relatives or to purchase goods for personal consumption. Further, officials at some ports of entry may have misunderstood the legal requirements. As Plaintiffs themselves admit, Pls. Br. at 11-12, after the onset of the COVID-19 pandemic, some field offices admitted Mexican nationals as B-1 nonimmigrants to donate plasma, believing it to be a permissible and essential service, while others did not. Davies Decl. ¶ 13; *see also* Wolfsing Decl. ¶ 7 (noting that "[o]n or after March 20, 2020 . . . CBP in Arizona and California did not allow Mexican nationals with B1/B2 visas to cross the border to donate plasma").

Officials in CBP's headquarters became aware of this inconsistency several months after DHS imposed its restrictions on non-essential travel, precluding many common purposes for a B1-/B-2 visa admission. Davies Decl. ¶ 13. After analyzing the issue, CBP headquarters issued the Guidance as an internal memorandum to advise CBP officers of

how selling plasma fit into the established INA framework and to ensure uniformity in administration of the B-1 visa requirements. *Id.* ¶ 14; Guidance at 1. This Guidance was consistent with a prior memorandum issued by CBP headquarters, which, among other things, advised CBP officers that B-1 visa holders may "not receive any salary or remuneration from any U.S. source" and that a "foreign company must maintain ultimate control over the B-1 alien's employment," such as "location[] in the United States," and "hours of work." Davies Decl. ¶ 15, Ex. 2.

Tellingly, Plaintiffs adduce no evidence that CBP headquarters, which is responsible for setting CBP's policy, ever formally sanctioned the kind of practice on which Plaintiffs built their business model—much less created something akin to a program that could have engendered legitimate reliance interests that CBP would have had to evaluate before promulgating the Guidance. *See* Pls. Br. at 24; *see generally Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1906, 1913 (2020) (reliance interests must be considered where agency created "a program for conferring affirmative immigration relief"); *Fogo de Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1144 (D.C. Cir. 2014) ("The mere fact that the agency, by mistake or oversight, approved' a visa petition on 'one occasion does not create an automatic entitlement to the approval of a subsequent petition.'" (quoting *Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 148 (1st Cir. 2007)). To the contrary, they acknowledge that CBP's prior statements on the issue noted that the agency's "policy was to evaluate each attempted entry . . . on a 'case-by-case basis.'" Pls. Br. at 24 (quoting "CBP Confirms Plasma Contributions Could Jeopardize Travel Visas," KRGV (Dec. 23, 2019), https://www.krgv.com/news/cbp-confirms-plasma-contributions-could-jeopardize-travel-visas/). And the evident inconsistency between "certain ports of entry in Texas [] allowing [B-1/B-2 visa] holders to enter the United States for the reported purpose of selling plasma" while "other ports of entry along the Southwest Border" were deeming this activity impermissible under the B-1 visa classification, Davies Decl. ¶ 13, defeats any claim of "binding precedent" or

consistent "pattern" that would require the agency to "articulate coherent reasons for a change in position," *Open Society Institute v. U.S. Citizenship & Immigration Serv's.*, No. CV 19-3620, 2021 WL 4243403, at *19 (D.D.C. Sept. 17, 2021) (citing *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) and *Fogo de Chao*, 769 F.3d at 1144 (emphasis added)).  *See also Bell Atl. Tel. Companies v. F.C.C.*, 79 F.3d 1195, 1207 (D.C. Cir. 1996) (rule did not upset reliance interests where the "state of the law has never been clear, and the issue has been disputed").

In any event, Plaintiffs are incorrect in claiming that CBP did not "'take[] into account'" their business model.  Pls. Br. at 25 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  The Guidance explicitly notes that "CBP understands the role of the plasma donation business in cross border commerce . . . along the U.S/Mexico border."  Guidance at 1.  This acknowledgment is similar to other acknowledgements that courts have found sufficient.  *See, e.g.*, *Open Society Institute*, 2021 WL 4243403, at *19 (finding sufficient agency's explanation that "'if the prior approvals were premised on a similar dearth of evidence, the approvals would have been issued in error'").  CBP was not required to say more.  *See, e.g.*, *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (purpose of *Fox Television* is "to ensure the agency's prior policies and standards are being deliberately changed, not casually ignored" (internal quotes and citation omitted)).  This is particularly true given that the Guidance does not "make worthless substantial past investment incurred in reliance upon [a] prior rule." *Bell Atl.*, 79 F.3d at 1207 (internal quotes and citations omitted).

Unable to show that the Guidance improperly reversed any formally established CBP policy, Plaintiffs generally contend that other agencies, such as the Food and Drug Administration (FDA), would have been aware that plasma donations came from Mexican nationals—and assert that CBP was required to consult with the FDA and consider the "impact of the [Guidance] on patients and patient health," Pls. Br. at 26-27. But these types of generalized complaints are unavailing.  The FDA does not enforce

immigration laws and has no authority to interpret visa requirements.  Plaintiffs identify no statutory provision—either in the INA or in some other statute—that would have required CBP to clear its application of the INA with public health authorities in this context.  *See id.*  More to the point, CBP was engaged in the interpretation of the INA—a statute it administers—and consultations with the FDA would not have been relevant to that interpretive task.  While other provisions of the INA include flexibility on the part of agencies to grant visas upon another agency's finding of special need or circumstance, the B-1 visa provisions contain no such requirements.  *Compare* 8 U.S.C. § 1184(c)(1) (authorizing consultation with other agencies for purposes of certain nonimmigrant visa petition adjudications) *with* 8 U.S.C. 1101(a)(15)(B) (defining B-1/B-2 visa criteria).  Thus, any additional consultation or analysis that CBP could have conducted would not have supplemented the analysis that CBP performed.

Simply put, Plaintiffs identify no authority for the Court to strike down an interpretative memorandum akin to the Guidance based on an agency declining to conduct consultations that are neither required by the statute nor relevant to the agency's interpretation of its authority.  Their challenge to the Guidance as arbitrary and capricious thus fails.

### C.   The Guidance Is, at Most, an Interpretative Rule that Did Not Require Notice or Public Comment

Finally, the fact that CBP issued the Guidance merely as an internal tool to assure that its officers were consistently applying established B-1 visa requirements defeats Plaintiffs' claim that the Guidance is invalid because it was not "formally promulgated through [the APA's] notice and comment" procedures.  Pls. Br. at 27.

The APA's notice and comment requirements apply only to "substantive" or "legislative" rules, *not* to interpretative rules or general statements of policy.  *Mendoza v. Perez*, 754 F.3d 1002, 1020-21 (D.C. Cir. 2014); *see* 5 U.S.C. § 553(b).  A "rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or

otherwise effects a substantive change in existing law or policy." *Mendoza*, 754 F.3d at 1021. Such rules are the product of an agency exercising its "delegated legislative power" from Congress. *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993). By contrast, rules that "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or 'merely track' preexisting requirements and explain something the statute or regulation already required," are interpretative. *Id.* (alteration omitted) (quoting *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236–37 (D.C. Cir. 1992)); *see also Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) ("critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers" (quotes and citation omitted)); *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (agency action determined to be interpretative rule where it was explicitly based upon an analysis of the meaning of the statute).

To distinguish legislative from interpretative rules, the D.C. Circuit has traditionally considered several factors: "(1) whether in the absence of the rule there would not be an adequate legislative basis for" agency action "(2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, [and] (4) whether the rule effectively amends a prior legislative rule." *Am. Mining Cong.*, 995 F.2d at 1112. An affirmative answer to any one of these four factors renders the rule legislative. *Id.* None of these factors are present here.

As a starting point, for all the reasons explained above, the Guidance does not alter or amend any prior rule. To the contrary, the Guidance tracks well-established precedent on the meaning of the INA's B-1 visa provisions and applies that precedent in the context of a particular set of facts. Even if the Guidance's interpretation were incorrect—which it is not—the interpretation would not itself alter the meaning of the underlying rule or

statutory scheme.  *See, e.g.*, *Cent. Tex. Tel. Co-op., Inc. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005) ("If, despite an agency's claim, a rule cannot fairly be viewed as interpreting—even incorrectly—a statute or a regulation, the rule is not an interpretive rule exempt from notice-and-comment rulemaking."); *Am. Min. Cong.*, 995 F.2d at 1113 ("An interpretive rule may be sufficiently within the language of a legislative rule to be a genuine interpretation and not an amendment, while at the same time being an incorrect interpretation of the agency's statutory authority.").  Rather, the Guidance would still "derive a proposition from an existing document whose meaning compels or logically justifies the proposition."  *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010).

For the same reasons, the Guidance is not itself a source of enforcement authority. The dispositive provisions are those of the INA, and the implementing regulations, which disallow a B-1 visa holder to engage in purely domestic business transactions.  Because the INA and the implementing regulations themselves impose these restrictions, "there is no legislative gap that required the [Guidance] as a predicate to enforcement action." *Am. Min. Cong.*, 995 F.2d at 1112.  Not surprisingly then, in issuing the Guidance, CBP did not "purport to act legislatively, either by including the [Guidance] in the Code of Federal Regulations, or by invoking its general legislative authority."  *Id.*  To the contrary, as detailed above, the agency issued the Guidance merely as an internal tool to ensure consistency in application of established criteria across CBP.  Requiring an agency to go through notice and comment before issuing these types of internal advisory memoranda is not only contrary to the APA's language and purpose, but would paralyze agencies' ability to ensure uniform application of the law.

As the D.C. Circuit has made clear, a rule does not become legislative "merely because it supplies crisper and more detailed lines than the authority being interpreted." *Id.*  Because CBP's Guidance plainly interprets the language of the INA and the implementing regulations, it was properly issued without notice and comment.

### III.   PLAINTIFFS FAIL TO SATISFY THE OTHER INJUNCTION FACTORS

The Supreme Court has made clear that the "extraordinary remedy" of a preliminary injunction may not be awarded when a plaintiff fails to demonstrate a likelihood of success on the merits. *Winter*, 555 U.S. at 22, 32-33; *see also Munaf*, 553 U.S. at 690 (likelihood of success requires far more than identifying "serious, substantial, difficult, and doubtful" questions); *Mazurek*, 520 U.S. at 972 ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (internal quotes and citations omitted; emphasis in original)).  Accordingly, Plaintiffs' failure to establish a cognizable APA claim is a basis to deny the injunction request outright.  *See, e.g., Sherley*, 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'").

Even if that were not the case, however, Plaintiffs still would not be entitled to the injunction because they cannot satisfy the demanding standard of showing that irreparable injury, balance of harms, and the public interest favor relief.  *See Winter*, 555 U.S. at 20.

### A.   Plaintiffs Have Not Established Irreparable Harm

Most significantly, Plaintiffs fail to establish that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.  Because a preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," *id.*, Plaintiffs' burden to show irreparable harm is necessarily higher than what is required to establish standing.  *See, e.g., Mazurek*, 520 U.S. at 972.  In their motion, Plaintiffs assert irreparable harm in the form of (1) impairment of their procedural notice-and comment rights; (2) prospective injury to patients; and (3) economic losses.  Pls. Br. at 30-35.  None withstands scrutiny.

*First*, Plaintiffs' claims of irreparable harm to their notice-and-comment rights merely conflates irreparable injury with the merits of Plaintiffs' position.  *See* Pls. Br. at

34.  As demonstrated above, Plaintiffs *had no* procedural right to receive notice of, or comment upon, the Guidance prior to its issuance.

*Second*, Plaintiffs' claims that the Guidance "*could* result in reduced production of" "plasma-based therapies" for patients, Pls. Br. at 30, are not only speculative insofar as they are based on an uncertain chain of projections, but also within the control of parties not before the Court—namely, the plasma collection companies. *Cf. Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("[T]he movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin.").  Plaintiffs have alleged that, at the current level of compensation the plasma companies offer their donors, the amount of plasma donations has decreased from 2019 levels. *See, e.g.*, Compl. ¶ 8.  This shortage might well dissipate if the plasma centers were willing to offer greater compensation to U.S. donors.  Those centers may be reluctant to do that because increasing such compensation could cut into their profits.  But that is a business decision on their part, and not attributable to the actions of CBP.

*Third*, and for similar reasons, the prospect of financial harm Plaintiffs allege is insufficient to carry the "heavy" burden of showing entitlement to an injunction.  "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012) ("[T]he fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm, for the harm must also be great, certain and imminent." (internal quote and citation omitted)).  Here, as noted above, Plaintiffs offer nothing beyond unvarnished statements to suggest that continued enforcement of CBP's Guidance is "certain" to result in plasma centers shuttering their operations and Plaintiffs losing employment.  *Cardinal Health*, 846 F. Supp. 2d at 211.  Even if such conclusory allegations sufficed for purposes of establishing standing, they fall short of showing "that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent,

29

and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).  Indeed, the evidence Plaintiffs provide offers no indication of how long the plasma centers could continue to operate at their current status—and how long they could do so if they decided to increase compensation to donors to make up for allegedly diminished plasma supply.  *See generally* Pls. Br. at 8-10; Procaccio Decl. ¶ 9; Cavanaugh Decl. ¶ 9.

Absent this evidence, Plaintiffs cannot be said to establish anything more than the abstract "possibility of irreparable injury."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  But, as the Supreme Court has emphasized, the "'possibility' standard is too lenient" a basis upon which to issue the drastic remedy of a preliminary injunction.  *Winter*, 555 U.S. at 22.  Given that irreparable harm is an indispensable element for a preliminary injunction, *id.*, Plaintiffs' failure to establish anything more than the theoretical possibility of harm is sufficient basis to deny the injunction they seek.

**B.**     **The Remaining Factors Weigh Against an Injunction**

On the other hand, the harm to the government and to the public interest from an injunction would be significant.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that harm to opposing party and weighing the public interest "merge" when relief is sought against the government).  A judicial injunction would intrude on the Executive's authority to interpret and implement the immigration statutes and contravene long-established principles governing B-1 visa requirements.  *See generally* Davies Decl. ¶ 15 (noting Guidance's similarity to prior memoranda).  In doing so, the injunction would introduce variation in how similar activities are treated under the B-1 visa classification, creating unpredictability in the law.  *Id.* ¶ 19 (identifying other industries that could be affected by how B-1 visa criteria are analyzed); *see generally Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 71 (D.D.C. 2010) ("The public interest is served by the consistent and uniform application of regulations to similarly-situated parties . . . .").

These harms would be compounded exponentially if any injunction the Court were to issue would generally permit purely domestic commercial activities under the framework of a B-1 visa.  As noted above, the current B-1 visa regime, which applies to millions of travelers seeking entry each year, carefully calibrates the conduct of international business against Congress's strong interests in protecting domestic workers from foreign competition.   *See, e.g.*, DHS, *U.S. Nonimmigrant Admissions: 2019*, https://www.dhs.gov/sites/default/files/publications/immigration-statistics/ yearbook/2019/nonimmigrant_2019.pdf at 3  (July 2020) (noting that there were more than 5.8 million B-1 "[t]emporary visitors for business" admitted in 2019).  Were this calibration disturbed, CBP's administration of the B-1 classification could be upended. *See* Davies Decl. ¶ 19.  And—even more significantly—the careful balance that Congress struck in crafting the INA's interrelated provisions would be disturbed.

Finally, Plaintiffs cannot claim the mantle of protecting public health through the injunction.  While Plaintiffs may indeed harbor fears about a decreased supply of plasma, it is within the power of the plasma companies to increase the compensation they provide—and thereby attract more donors.  The companies' reluctance to do so may be a justifiable business decision.  But that business decision does not justify the injunction Plaintiffs seek.

## **CONCLUSION**

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Alexander V. Sverdlov*
ALEXANDER V. SVERDLOV
  (NY No. 4918793)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-8550
alexander.v.sverdlov@usdoj.gov

Dated:  February 11, 2022          *Attorneys for Defendants*