# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HECTOR AMAYA., *et al*,

        *Plaintiffs*,

    v.

U.S. CUSTOMS AND BORDER PROTECTION,
*et al*,

        *Defendants*.

Civil Action No. 1:22-cv-242

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................3

I.      PLAINTIFFS HAVE ARTICLE III STANDING ......................................... 3

     A.      The Plasma Ban Is Causing Plaintiffs' Injuries ....................................3

     B.      Enjoining the Plasma Ban Would Redress Plaintiffs' Injuries ...............8

II.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................... 10

     C.      Plasma Donation Is Not Impermissible "Labor or Employment" ........10

     D.      The Plasma Ban Is Arbitrary and Capricious ......................................16

     E.      The Plasma Ban Required Notice-and-Comment Rulemaking .............20

III.      THE EQUITIES AND PUBLIC INTEREST SUPPORT INJUNCTIVE RELIEF ......... 21

     A.      Plaintiffs Face Irreparable Harm ........................................................21

     B.      The Balance of the Equities and Public Interest Favor an Injunction ..................23

CONCLUSION ...............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Federation of Government Employees, AFL–CIO v. U.S.*,
    104 F.Supp.2d 58 (D.D.C. 2000) ........................................................................22

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ..............................................................................6

*In the Matter of B— and K—*,
    6 I. & N. 827 (BIA 1955) ...................................................................................14

*Matter of Camilleri*,
    17 I. & N. Dec. 441 (BIA 1980) .........................................................................13

*Cardinal Health, Inc. v. Holder*,
    846 F. Supp. 2d 203 (D.D.C. 2012) ...................................................................23

*Matter of Cote*,
    17 I.& N. Dec. 336 (BIA 1980) ..........................................................................13

*CSL Plasma Inc. v. U.S. Customs & Border Prot., No. 21-CV-02360 (TSC)*,
    2021 WL 5869149 (D.D.C. Dec. 3, 2021) ...........................................................3

*Dillmon v. Nat'l Transp. Safety Bd.*,
    588 F.3d 1085 (D.C. Cir. 2009) .........................................................................20

*Matter of Duckett*,
    19 I. & N. Dec. 493 (BIA 1987) .........................................................................13

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
    653 F.3d 1 (D.C. Cir. 2011) ...............................................................................20

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ...........................................................................................19

*Exhaustless Inc. v. Fed. Aviation Admin.*,
    931 F.3d 1209 (D.C. Cir. 2019) ...........................................................................4

*Fischbein v. Olson Rsch. Grp., Inc.*,
    959 F.3d 559 (3d Cir. 2020) ..............................................................................10

*Fogo de Chao v. DHS*,
    769 F.3d 1127 (D.C. Cir. 2014) .....................................................................18, 19

*In the Matter of G— and P—,*
4 I&N Dec. 217 (BIA 1950) .................................................15

*Matter of G—,*
A-7182159 (C.O. 1949) ....................................................15

*Garavito v. U.S.I.N.S.,*
901 F.2d 173 (1st Cir. 1990) ............................................12

*Guilford Coll. v. McAleenan,*
389 F. Supp. 3d 377 (M.D.N.C. 2019) ............................23

*Matter of Hira,*
11 I. & N. Dec. 824 (BIA 1966) .......................................13

*League of Women Voters of United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ..............................................21

*Lee v. Christian Coalition of America,*
160 F.Supp.2d 14 (D.D.C. 2001) .....................................22

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)............................................................4

*Mendoza v. Perez,*
754 F.3d 1002 (D.C. Cir. 2014) .......................................20

*Mylan Labs., Inc. v. Leavitt,*
484 F. Supp. 2d 109 (D.D.C. 2007) .................................23

*Open Society Institute v. USCIS,*
No. CV 19-3620 (RDM), 2021 WL 4243403 (D.D.C. Sept. 17, 2021).................................17

*Physicians for Soc. Resp. v. Wheeler,*
956 F.3d 634 (D.C. Cir. 2020) .........................................17

*Puerto Rico Sun Oil Co. v. U.S. E.P.A.,*
8 F.3d 73 (1st Cir. 1993) ..................................................18

*Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.,*
489 F.3d 1267 (D.C. Cir. 2007) ........................................4

*Silguero v. CSL Plasma Inc.,*
907 F.3d 323 (5th Cir. 2018), 2018 WL 889624 ............15

*Spitzer Great Lakes, Co. v. U.S. E.P.A.,*
173 F.3d 412 (6th Cir. 1999) ...........................................18

*Texas Children's Hosp. v. Burwell*,
   76 F. Supp. 3d 224 (D.D.C. 2014) ............................................................................23

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   485 F. Supp. 3d 1 (D.D.C. 2020) ..............................................................................22

*Yale-New Haven Hosp. v. Leavitt*,
   470 F.3d 71 (2d Cir. 2006) ........................................................................................18

**Statutes**

8 U.S.C. § 1101(a)(15)(B) .............................................................................................10, 12

**Regulations**

22 C.F.R. § 41.31 ............................................................................................................10, 12

22 C.F.R. § 41.31(b)(1) .........................................................................................................12

Genco Op. No. 93-95, HQ 235-C, 1993 WL 1504042 (Dec. 28, 1993) .............................14

**Other Authorities**

Andrew Pollack, *Is Money Tainting the Plasma Supply?*, N.Y. Times (Dec. 5,
   2009) ...........................................................................................................................18

# INTRODUCTION

Defendants' opposition brief is most noteworthy for what it does not say. Defendants do not dispute that, pursuant to a 30-year practice, B-1 visa holders from Mexico were overwhelmingly permitted to enter the United States to donate plasma at centers that provide a payment to donors. In light of this, Defendants cannot seriously dispute that the Plasma Ban represents a sea change from longstanding prior practice with respect to Mexican national plasma donors.

Struggling under the weight of these unavoidable concessions, just as they did in the prior litigation brought by CSL and Grifols, Defendants try to insulate the over-reach of the Plasma Ban from review altogether—this time by arguing that Plaintiffs lack Article III standing. Defendants' standing arguments make one thing clear: Under Defendants' view, *nobody* can bring an APA challenge to the Plasma Ban. Plasma collection companies cannot challenge it because they do not fall within the INA's zone of interests (despite having Article III standing), and American workers, donors, and patients cannot challenge it because they lack Article III standing (despite falling within the INA's zone of interests). But the Court need not accept Defendants' efforts to shield the Plasma Ban from any and all judicial review. Substantial evidence confirms that the Plasma Ban, now in effect for eight months, is directly causing a precipitous drop in donations at plasma centers on the border, which has caused plasma centers to reduce hours, cut payroll, and contemplate laying off workers. Unless the Plasma Ban is reversed, it's inevitable that many, if not all, Plaintiffs will lose their jobs and livelihoods. That evidence is more than sufficient to establish standing.

Defendants' merits arguments fare no better. First, Defendants argue that plasma donation constitutes impermissible "local employment or labor," even though the Justice Department recently adopted the opposite position and argued—consistent with common sense—that plasma donation is not "labor" at all, local or otherwise. Moreover, even if plasma donation constitutes "labor," in this case the labor—when rendered by Mexican donors who enter the United States to

1

donate plasma to companies owned by foreign parents which then export much of the plasma to destinations outside the United States—is certainly not "local" labor under the relevant immigration cases. Second, Defendants argue that the Plasma Ban is not arbitrary and capricious because replacing a highly permissive approach with a categorical prohibition on plasma donation supposedly is not a change that requires a reasoned explanation, or, alternatively, a single sentence from a formerly undisclosed internal memo is all the explanation required.  And third, Defendants incorrectly characterize the Plasma Ban as mere interpretative guidance that did not require notice-and-comment rulemaking, conspicuously ignoring the Plasma Ban's grave effects on Plaintiffs, plasma donors, border communities, and patients.

The equities and public interest likewise support entry of a preliminary injunction.  Defendants acknowledge that Plaintiffs' economic losses are unrecoverable and therefore irreparable.  As for the extreme harm to patients that will inevitably arise when the reduction in plasma donations due to the Plasma Ban limits production of plasma-derived therapies, Defendants speculate that companies like CSL Behring and Grifols might be able to mitigate such harm by offering more money to American donors.  Such speculation is factually incorrect, as has been demonstrated by the companies' real world experience of dramatically raising the payments for American donors and *still* being unable to fulfill the shortfall; demand continues to outstrip supply as more and more patients are diagnosed as in need of plasma-derived therapies.  And in any event, it would be cold comfort to the Employee Plaintiffs and Donor Plaintiffs in the border region, where centers would inevitably be closed because there are insufficient American donors to support them.

The Court should grant a preliminary injunction blocking the Plasma Ban pending resolution of this lawsuit to avoid substantial irreparable harm and damage to public health.

**ARGUMENT**

## I.  PLAINTIFFS HAVE ARTICLE III STANDING

To begin, Defendants *do not dispute* that Plaintiffs have suffered concrete economic injuries sufficient to confer Article III standing. *See* Opp. at 9; Compl. ¶¶ 78-79. And they *do not dispute* that Plaintiffs are "among those the Court has previously identified as falling within the B-1/B-2 program's zone of interest[s]." Opp. at 2. Nor could they. Defendants repeatedly told this Court in the prior case brought by CSL Plasma and Grifols that the INA protects "American workers," Defs.' Opp. at 8, *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, No. 21-cv-2360 (TSC) (D.D.C.), and this Court adopted Defendants' argument that only American workers can challenge the Plasma Ban under the APA, *see* 2021 WL 5869149, at *4 (D.D.C. Dec. 3, 2021) ("A statute designed to protect American workers places those workers in its zone of interest and confers upon them 'a proper ground for standing.'"). Yet, having prevailed on their zone-of-interest defense in that case, Defendants now argue that American workers—the very parties they suggested could properly bring suit—lack Article III standing to challenge the Plasma Ban.

Defendants' bait and switch is as cynical as it is predictable. And it is also wrong. Plaintiffs' standing flows from a simple causal chain supported by ample evidence. The Plasma Ban will directly cause the plasma centers where Plaintiffs work and donate plasma to reduce hours, cut payroll, lay off workers, and close facilities. That is harming the Employee Plaintiffs who are losing wages, the Donor Plaintiffs who rely on the payments the centers provide, and the Patient Plaintiffs who depend on plasma-derived therapies. And the only feasible way to redress those harms is to permit Mexican nationals with B-1/B-2 visas to resume donating at these centers.

### A.  The Plasma Ban Is Causing Plaintiffs' Injuries

Again, Defendants do not dispute that Plaintiffs have suffered an Article III injury in fact. *See* Opp. at 9. Defendants instead argue that Plaintiffs' injuries—the imminent threat to their

wages and livelihoods—have not been caused by the Plasma Ban but by "decisions that the[] *plasma centers* have made." *Id.* at 11. But those inevitable decisions by plasma centers—reducing operating hours, cutting payroll, laying off employees, and closing facilities—are not, as Defendants assert, "independent" of the Plasma Ban. *Contra id.* at 10 (quoting *Exhaustless Inc. v. Fed. Aviation Admin.*, 931 F.3d 1209, 1212 (D.C. Cir. 2019)). They are directly and proximately caused by it: The Plasma Ban has caused a "dramatic[] and immediate[]" drop in donations at plasma centers where Plaintiffs work and donate, Compl. ¶ 8, and that drop in donations has already forced these centers to reduce hours by as much as 40% and cut payroll by $3.2 million, and it will soon force them to close facilities, *id.* ¶¶ 14-23, 78-79. Plaintiffs have supported that "causative link" not only with "factual allegations," Opp. at 10 (quoting *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007)), but with substantial and undisputed evidence "that those choices [by the plasma centers] have been or will be made" *because* the Plasma Ban is making it impossible for plasma centers to maintain normal operations at the southern border, *id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

Plaintiffs submitted unequivocal and undisputed evidence—developed by a third party—demonstrating that the Plasma Ban is directly causing a "[p]recipitous further decline" in plasma donations beyond the decrease already caused by the COVID-19 pandemic. PPTA Presentation at 6 (ECF 4-1); *see also id.* at 7 (supporting data). As the President and CEO of the Plasma Protein Therapeutics Association stated, "[s]ince the announcement of CBP's Plasma Ban in mid-June" the "approximately 50 plasma centers located in the U.S.-Mexico border zone" have "experienced a dramatic decline in collections"—by as much as "90%" at some centers. Efantis Decl. ¶¶ 11-12, 14 (ECF 3-1). She further stated that the Plasma Ban is having a "chilling effect" on donors by "instilling fear" that crossing the border and donating plasma could result in the "potential loss of their B-1 or B-2 visas." *Id.* ¶ 18. And executives at CSL Plasma and Grifols confirmed that

"following the imposition of the Plasma Ban by CBP in June 2021, there was a sudden and sub-stantial decline in plasma donations made at all of [CSL Plasma's and Grifols'] border collection centers" beyond that seen previously during the COVID-19 pandemic. Cavanaugh Decl. ¶ 5 (ECF 3-14); Procaccio Decl. ¶ 5 (ECF 3-20).

This "sudden and substantial decline in plasma donations" caused by the Plasma Ban, *id.*, has already caused plasma centers to reduce hours and cut payroll (which, tellingly, they did not do in the pandemic period preceding the Plasma Ban), and it will soon force them to close facilities. Executives at CSL Plasma and Grifols confirm that the companies have already "reduced operating hours at various centers" due to the Plasma Ban. Cavanaugh Decl. (ECF 3-14) ¶ 6; Procaccio Decl. (ECF 3-20) ¶ 6. They further explained that "if the Plasma Ban continues in force [they] will likely be forced to shut down" multiple facilities on the southern border, including CSL Plasma's "three Brownsville, TX locations and another in Nogales, AZ," Cavanaugh Decl. (ECF 3-14) ¶ 9, as well as Grifols' "downtown El Paso collection center," Procaccio Decl. (ECF 3-20) ¶ 9. And, more broadly, the Plasma Ban has already caused a $3.2 million reduction in payroll at border collection centers. PPTA Presentation (ECF 4-1) at 12. Defendants selectively quote from Plaintiffs' decla-rations to suggest that perhaps the COVID-19 pandemic, not the Plasma Ban, is causing border collection centers to reduce hours and close facilities. Opp. at 12. But the Plasma Ban was an-nounced well over a year into the pandemic. All the evidence demonstrates that the Plasma Ban caused a sharp decrease in donations at border centers *far beyond* that seen earlier on during the pandemic. *See* PPTA Presentation (ECF 4-1) at 6-7; Efantis Decl. (ECF 3-1) ¶¶ 11-12, 14, 18; Cavanaugh Decl. (ECF 3-14) ¶ 5; Procaccio Decl. (ECF 3-20) ¶ 5. And the cuts to hours and payroll—and the imminent closures—arose only *after* the Plasma Ban went into effect.

Those reduced hours and payroll cuts are already harming Plaintiffs. One Plaintiff's hours have been "cut by 40%." Angulo Decl. (ECF 3-10) ¶ 6. Others describe very real fears that, if the

Plasma Ban remains in effect, they may lose their livelihoods, putting them "in danger of being evicted," Felix Decl. (ECF 3-7) ¶ 6; McCrimmon Decl. (ECF 3-9) ¶ 6, and unable to "provide food and shelter" to their families, Amaya Decl. (ECF 3-3) ¶ 6, Miranda Decl. (ECF 3-10) ¶ 6.

For their part, Defendants do not meaningfully dispute the fact that, "while [the Plasma Ban] 'remain[s] in force, the centers' employing [Plaintiffs] have reduced their operations and 'will be shut down.'" Opp. at 11 (quoting Compl. ¶¶ 78-79). And they acknowledge that plasma centers are having to make these cuts "in response to the decreased availability of [Mexican] nationals as a donation source." *Id.* Their objection is that the complaint and supporting declarations "offer[] no elaboration" or "detail" to substantiate these facts. *Id.* But that is simply false. Plaintiffs submitted substantial and unrefuted evidence that hours have been reduced at some plasma centers by as much as 40%, *see* Angulo Decl. (ECF 3-10) ¶ 6; Cavanaugh Decl. ¶ 6; Procaccio Decl. ¶ 6, that payrolls have already been cut by millions of dollars, *see* PPTA Presentation (ECF 4-1) at 12, and that CSL Plasma and Grifols are preparing to close *specific* collection centers located on the border if the Plasma Ban remains in force, *see* Cavanaugh Decl. ¶ 9; Procaccio Decl. ¶ 9. These are not "conclusory assertions." *Contra* Opp. at 11. They are facts, based on evidence.

Defendants complain that Plaintiffs "do not offer … an estimate of how long the centers would continue to remain in operation under current circumstances, or when closures would take place." Opp. at 12. Plaintiffs have confirmed that those closures are imminent. Grifols, for example, forecasts that if the Plasma Ban remains in effect, it will be forced to begin laying off workers and closing border collection centers in as few as 2 months. Procaccio Reply Decl. ¶ 9.  In any event, Defendants ignore the fact that hours and payroll have *already* been cut. Indeed, one Plaintiff has had his hours "cut by 40%." Angulo Decl. (ECF 3-10) ¶ 6. That is not a mere "prediction[]"; it is a "historical" "demonstrable" fact. *Contra* Opp. 11 (quoting *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015)).

Defendants do not dispute that the plasma centers "'have long relied on' availability of plasma from Mexican donors and built their operations around that model." Opp. 12 (quoting Compl. ¶ 34). Yet they insist that the centers themselves can solve the drop in donations caused by the Plasma Ban by "increas[ing] the compensation [they] currently offer[] at [border] centers to attract more domestic (or other authorized) donors." *Id.* This assertion is a transparent effort to shift the blame for exacerbating the plasma shortage from Defendants' disastrous policy to the businesses that have been harmed by it. Defendants' blame game, moreover, is belied by the facts. CSL Plasma and Grifols have already gone to great lengths to attract American donors, including by increasing donor payments substantially. Grifols, for example, "has more than doubled its donor fees throughout the United States in the last two years," yet "still suffered a decrease in plasma collections by more than 20%" even before the effects of the Plasma Ban had been felt. Procaccio Reply Decl. ¶ 5.

And the problem runs even deeper. The centers where Plaintiffs work and donate plasma are located in communities that do not have sufficiently large populations to replace the Mexican donors excluded by the Plasma Ban. *Id.* ¶ 4-5. The numbers speak for themselves: Border centers saw donations decline *by as much as 90%* immediately following the ban. Efantis Decl. (ECF 3-1) ¶¶ 11-12, 14; PPTA Presentation (ECF 4-1) at 6-7. The fact is that "[n]o amount of increase in donor fees or change in marketing strategy will be able to replace this Mexican population in these centers." *Id.* ¶ 4. They "cannot remain viable with the limited population of potential donors on the United States side of the border." *Id.* ¶ 3.

Defendants suggest that the plasma centers "could relocate their centers to areas where there are more domestic donors who would sell their plasma." Opp. at 12. But even if that could solve the problem *for the plasma collection companies* (and it cannot), it would do nothing to alleviate the harms *to Plaintiffs*. The Employee Plaintiffs will still lose their jobs (or be forced to

move away from their communities); the Donor Plaintiffs will still lose an important source of income; and the Patient Plaintiffs will still suffer shortages. "[F]rom the time a liter of plasma is collected until a final medicine is ready to be given to a patient is nine to twelve months." Procaccio Reply Decl. ¶ 7. Coupled with the time to establish new centers elsewhere, this means that the shortage exacerbated by the Plasma Ban "will take four to six years" to recover from, at best. Procaccio Reply Decl. ¶ 7. And the substantial increased costs entailed by increasing donor payments or moving operations could render some plasma products prohibitively expensive. *Id.*

### B.     Enjoining the Plasma Ban Would Redress Plaintiffs' Injuries

Enjoining or rescinding the Plasma Ban is the only feasible way to redress Plaintiffs' injuries because it is the only way to restore donation levels to where they were before the Plasma Ban went into effect. Once donations are restored, it follows that the border centers where Plaintiffs work and donate will be able to maintain operations, as they had prior to the Plasma ban.

Defendants blame Plaintiffs for not "identify[ing] [the] particular increase in donations that the centers need to increase operations and stay open." Opp. at 15. But such granular details are unnecessary to show redressability in a case like this. The facts prove that the Plasma Ban caused a dramatic and immediate decline in donations that were localized to the border centers where Plaintiffs work and donate; no non-border center has suffered a drop in collections remotely close to those experienced at the border. *See supra* Section I.A. And that decline is directly responsible for these centers having to cut hours and payroll. *Id.* From that evidence, it follows—as a matter of logic and common sense—that once the Plasma Ban is lifted, and Mexican nationals are confident that they can use their B-1 visa or Border Crossing Card without fear of violating Defendants' "Guidance," donations will return to the status quo ante and the centers will resume normal operations. Procaccio Reply Decl. ¶ 10.

Defendants speculate that maybe donors would be deterred by the COVID-19 pandemic

and thus not "resume their prior rates of donations." *See* Opp. at 15. But the pandemic had already been raging for over a year when CBP announced the Plasma Ban, and the border centers saw a "[p]recipitous further decline" in donations *beyond* the decrease already caused by the COVID-19 pandemic. PPTA Presentation (ECF 4-1) at 6-7. All of the evidence supports the logical inference that the Plasma Ban, not the pandemic, is stopping Mexican B-1/B-2 visa holders from donating.

Defendants' also suggest that "there is significant reason to doubt that the conduct of third parties *would* significantly change were this Court to enjoin [the Plasma Ban]." Opp. 15. But their only evidence to support this "doubt" is that, as the U.S.-Mexico border has reopened, "CBP has not seen a commensurate increase in the number of people declaring that they are traveling to sell their plasma." *Id.* But *of course* Mexican B-1/B-2 visa holders are not entering the United States to donate plasma: *CBP has banned them from doing so*. Defendants' apparent expectation that Mexican nationals would rush to the border to declare their intention to break the law (at the risk of losing their visas) boggles the mind.

Defendants also complain that there is no evidence "that [the Plasma Ban] has chilled potential donors from seeking to enter the country." Opp. at 16. That statement is, frankly, absurd. Why would Defendants announce the Plasma Ban if not to dissuade Mexican nationals from entering the United States to donate plasma? That is its very purpose. Beyond that, Plaintiffs have submitted substantial, unrebutted evidence that the Plasma Ban has, in fact, caused a dramatic and immediate drop in plasma donations at collection centers on the border. *See* PPTA Presentation (ECF 4-1) at 6-7; Efantis Decl. (ECF 3-1) ¶¶ 11-12, 14; Cavanaugh Decl. (ECF 3-14) ¶ 5; Procaccio Decl. (ECF 3-20) ¶ 5. And the President and CEO of the Plasma Protein Therapeutics Association specifically stated that the Plasma Ban is likely having a "*chilling effect*" on donors by "instilling fear" that crossing the border and donating plasma could result in the "potential loss of their B-1 or B-2 visas." Efantis Decl. (ECF 3-1) ¶ 18 (emphasis added).

Simply put, all the evidence supports a strong inference that if the Plasma Ban is enjoined or rescinded, Mexican B-1/B-2 visa holders will resume donating, which will enable the border centers to resume normal operations. That will not only redress the Employee Plaintiffs' and Donor Plaintiffs' injuries, it will also ameliorate the ongoing plasma shortage, ensuring that the Patient Plaintiffs have access to the plasma-derived therapies their health depends on.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### C.   Plasma Donation For a Fee is Permissible "Business," Not Impermissible "Labor or Employment"

The INA and its regulations authorize the issuance of B-1 visas to those entering the United States to engage in "business," but not to those intending to engage in "labor," if the labor is "local" in nature.  8 U.S.C. § 1101(a)(15)(B); 22 C.F.R. § 41.31.  As demonstrated below, the donors are clearly engaged in "business," are clearly *not* engaged in "labor," and even if engaged in "labor," are clearly *not* engaged in "local" labor.  Consequently, there is no bar to their entering the United States with B-1 visas.

**1.**  The term "business" is broad, more than capable of including the donation of plasma and receipt of payment.  *See Fischbein v. Olson Rsch. Grp., Inc.*, 959 F.3d 559, 563 (3d Cir. 2020) (blood donation with payment is a "commercial transaction").  Defendants' own examples of permissible "business" activities illustrate the term's elasticity.  *See* Opp. at 19-20 ("[n]egotiat[ing] contracts," "[c]onsult[ing] with business associates," "[p]articipat[ing] in scientific, educational, professional, or business conventions," participating in "a competition for which there is no remuneration other than a prize," "professional athletes … competing for prize money").

If donating plasma for pay amounts to "business," the next issue is whether it falls within the exception prohibiting "labor."  Plaintiffs' opening brief established the direct conflict between CBP's new position that plasma donation is "labor" and the Justice Department's recent assertion

in the *Gomez* case that plasma donation is not "labor."  *See* Statement of Interest of the United States at 8, *Gomez v. CSL Plasma Inc.*, No. 20-cv-2488 (July 14, 2021) (ECF No. 50) ("*Gomez* SOI").  Defendants primarily argue that the two cases are different because they involve different statutes.  Opp. at 20-21.  But that is a distinction without a difference.  It makes no sense to say that plasma donation constitutes "labor" under the INA but does not constitute "labor" for purposes of the ADA.  And while Defendants focus on the Justice Department's statements in *Gomez* that plasma donation centers are "service establishments" under the ADA, they largely ignore the Justice Department's repeated specific assertions that it is "mistaken" to contend that plasma donation is "akin to employment or contract work."  *Gomez* SOI at 8.  Those unequivocal statements are flatly inconsistent with CBP's contention in the Plasma Ban that plasma donation constitutes "labor," *i.e.*, "employment or contract work."  Importantly, the Government's argument in *Gomez* was based more on dictionary definitions and "ordinary, contemporary, common meaning" than on any peculiarity of the ADA.  *Gomez* SOI at 4.  Defendants' attempt to distinguish the Justice Department's unequivocal statements in the *Gomez* Statement of Interest from CBP's position in the Plasma Ban also would lead to absurd results.  Under Defendants' extreme view that the receipt of any payment in the United States transforms an otherwise permissible activity into "labor," a B-1 visa holder would apparently violate the terms of their visa if they dropped off used cans and bottles at a recycling center in the United States or opened a bank account here.  *See Gomez* SOI at 8 (noting that "[m]ost service establishments receive compensation from their customers, but some, such as banks, recycling centers … [etc.] compensate their customers").

Because plasma donation is a "business" activity, not "labor," the analysis should be over.  But rather than accept this straightforward approach, Defendants seek to impose another restriction on B-1 visa holders.  They contend that it is not sufficient for Plaintiffs to show that Mexican national plasma donors are engaged in "business" but not "labor."  According to Defendants, the

Mexican national must be engaged in business that is "international," or, as Defendants put it, business that is a "necessary incident to international trade or commerce." *Id.* at 17.

This contention conflates two separate inquiries under the INA. The first inquiry is whether a foreign national's planned activity in this country is either "business" or "labor," no more. This flows directly from the language of the statute, which, in relevant part, allows entry to "an alien … other than one coming for the purpose of … performing *skilled or unskilled labor* … who is visiting the United States temporarily for *business*." 8 U.S.C. § 1101(a)(15)(B) (emphases added). The statute does not make reference to any "international" requirement. It sets up a simple dichotomy: business, yes; labor, no. Thus, if a B-1 visa holder is entering for business that is *not labor*, the inquiry is over and the individual is admissible. For example, a B-1 visa is appropriate for an individual who seeks to enter this country to develop and direct the operations of a gas station he owns, an activity which is as local as one could imagine. *See, e.g.*, *Garavito v. U.S.I.N.S.*, 901 F.2d 173, 174 (1st Cir. 1990). Because that activity does not amount to "labor," it does not matter whether it is local or not.

That is not to say that an inquiry into whether a person's activity is "local" or "international" in character is always irrelevant. If the first step of the analysis indicates that the foreign national is indeed entering to perform "labor," then the relevant regulations require a second step. Under those regulations, not *all* labor is barred under a B-1 visa, only "*local* employment or labor for hire." 22 C.F.R. § 41.31 (emphasis added). Moreover, the regulations apply an even tougher standard, requiring not only that the labor be "local" but "purely local." *See* 22 C.F.R. § 41.31(b)(1) ("building or construction work, whether on-site or in plant, shall be deemed to constitute purely local employment or labor for hire"; "supervision or training of others engaged in building or construction work … shall not be deemed to constitute purely local employment or labor for hire"). And Defendants appear to adopt this "purely" local standard. *See* Opp. at 5 ("CBP has long taken

the position that purely 'local employment or labor for hire' in the United States is impermissible under the B-1 visa classification.").

As the caselaw makes clear, not all labor performed in the United States is necessarily local (much less "purely local") simply by having been performed here.  Rather, even labor performed in the United States can be deemed non-local by virtue of being "incident to international trade or commerce."  *Matter of Camilleri*, 17 I. & N. Dec. 441, 444 (BIA 1980); *see Matter of Duckett*, 19 I. & N. Dec. 493, 497 (BIA 1987) (Canadian railroad clerk employed by a Canadian railroad who entered the United States on a daily basis to clear his employer's railroad cars for transport from the United States to Canada was not engaged in "purely local employment"); *Matter of Camilleri*, 17 I. & N. Dec. 441, 444 (BIA 1980) (Canadian truck driver who delivered goods from Canada to the United States not engaged in "local employment"); *Matter of Cote*, 17 I.& N. Dec. 336, 338 (BIA 1980) (same); *Matter of Hira*, 11 I. & N. Dec. 824, 827 (BIA 1966) (tailor from India, even though paid to take measurements of prospective customers in the United States, was eligible for a B-1 visa where he was employed by custom clothing manufacturer in Hong Kong;  the tailor "was involved [in] international trade or commerce and the employment was a necessary incident thereto").

Applying this analysis here, under the first inquiry, plasma donation is not "labor" at all and is therefore a permissible activity for B-1 visa holders who are coming here on business to donate and receive payment.  Defendants do not even try to argue that plasma donation is "labor" under any ordinary, commonsense meaning of the term.  That alone resolves the issue.

**2.**  But even if plasma donation were "labor" (contrary to the term's ordinary meaning and the Justice Department's own position in *Gomez*), it is not "purely local" labor barred by the regulations.  As the parties agree, *Matter of Hira* is the seminal case in this regard.  11 I. & N. Dec. 824, 827 (BIA 1966); Opp. at 18.  That case offers four factors in determining whether labor is

"local," and Defendants dispute just one: whether the donors have a "principal place of business" in Mexico. Opp. at 18. But the donors live in Mexico. The plasma they donate is created by them in Mexico. Their cross-border travel simply transports that plasma to a donation center in the United States. This activity is indistinguishable from that of, say, the couriers discussed by the General Counsel to CBP's predecessor agency. Genco Op. No. 93-95, HQ 235-C, 1993 WL 1504042 (Dec. 28, 1993). Like those couriers, plasma donors are carrying a substance that "originate[s] in Mexico." *Id.* Like the couriers, plasma donors carry that substance to the United States. *Id.* Like the couriers, plasma donors are paid "by the U.S. laboratory in dollars, rather than in pesos." *Id.* Accordingly, like the couriers, plasma donors are engaged in activity consistent with the terms of the B-1 visa.

What's more, the connection between plasma donation and "international trade or commerce" is plain. Mexican national plasma donors play a critical role in the "international trade or commerce" of blood plasma, which is used to manufacture life-saving therapies relied upon by patients not only in the United States but around the world. Plasma donated by Mexican nationals is essential to the global plasma supply. Indeed, plasma donations from B-1 visa holders are responsible for an estimated 5-10% of the plasma collected in the United States, which is the largest plasma collector globally. *See* Cavanaugh Decl. ¶ 5 (ECF 3-14); Procaccio Decl. ¶ 5 (ECF 3-20). And CBP's internal Plasma Ban memo explicitly refers to "the role of the plasma donation business in cross border commerce." Davies Decl. Ex. 1 (ECF 9-1).

The Mexican national plasma donors are akin to farmers entering the U.S. to sell produce that is grown abroad—which the BIA has recognized as a permissible B-1 business activity since at least the 1940s. For example, in *In the Matter of B— and K—*, 6 I. & N. 827 (BIA 1955), two Canadian fruit and vegetable farmers were permitted to enter the U.S. on a B-1 visa to sell their produce in Detroit. The BIA held that selling the produce in Detroit was permissible because it

14

was "merely incidental" to the applicant's "primary business … of farming in Canada." *See also Matter of G—*, A-7182159 (C.O. 1949) (Mexican national admissible for the purposes of selling green peppers in the U.S.) (discussed in *In the Matter of G— and P—*, 4 I&N Dec. 217 (BIA 1950)). Like a farmer, a Mexican national plasma donor spends majority of his or her time "growing" their plasma. That "growing" takes place not in the United States, but abroad, in Mexico. In both cases, the act of entering the U.S. to sell their produce (or donate their plasma) is a small fraction of the broader commercial transaction, which primarily takes place outside of the U.S.

For that reason this case is markedly different from the hypothetical posed by Defendants. They argue that "[i]f the presence of a foreign worker were enough to transform a purely domestic transaction into an international business, any 'local employment' of a foreign national would qualify for the B-1 'business' purpose." Opp. at 16. But Plaintiffs are not arguing that plasma donation is not "purely local" simply because the donors are Mexican and happen to donate in the United States. Rather, it is not "purely local" because the product Mexican donors are donating— their blood plasma—was grown at home in Mexico, akin to the produce grown by the farmers in *In the Matter of B— and K—*, and then transported to the United States.

In short, donating plasma is not labor, and even if it were, it is not "local" labor, given that plasma donation is part of international trade and commerce to obtain plasma in a quantity and of a quality that is available in Mexico, but not in the United States.

\* \* \*

The Government was correct the first time when it concluded that plasma donation is not "labor." *Gomez* SOI at 8. Since at least 2015, the Government has consistently advanced the position that plasma donors are not in any sense employed by, or otherwise working for, the collection centers where they donate, notwithstanding their receipt of payment. *See* Br. for U.S. as Amicus Curiae Supporting Neither Party, *Silguero v. CSL Plasma Inc.*, 907 F.3d 323 (5th Cir.

15

2018) (No. 17-41206), 2018 WL 889624.  This Court should not indulge the Government's tor-tured attempt to advance diametrically opposed definitions of "labor" in two different cases.

### D.     The Plasma Ban Is Arbitrary and Capricious

The Plasma Ban is arbitrary and capricious because it is an unexplained departure from prior agency policy and practice under which B-1 visa holders were generally permitted to enter the United States to donate plasma and receive a payment. Defendants contend that, since at least 2019 and before the onset of COVID-19 in early 2020, CBP had a "policy" of allowing CBP officers to exercise discretion in evaluating entry by plasma donors on B-1 visas on a "case-by-case basis."  Opp. at 5.  Even if there was  such a policy, that policy does not sustain CBP's position.

First, this supposed prior "case-by-case" policy for entry by plasma donors is nonsensical. A "case-by-case" review calls for the application of discretion.  But unlike other admissibility determinations that may be heavily fact-specific and therefore susceptible to discretion (*e.g.*, whether a foreign national presents a national security threat), there is no room for discretion in determining whether an individual is admissible to donate plasma and receive a payment.  The determination of whether donating plasma constitutes labor is a legal determination, not a discre-tionary one, requiring a simple yes or no answer that will be applicable in each case, not differing "case-by-case."  The CBP officers at the border had to develop a consistent practice.  Not surpris-ingly, they did so; and hence the nearly universal, decades-long *practice* of allowing plasma donors to enter on B-1 visas.  Wolsing Decl. ¶ 7 (ECF 3-19); *see also* Procaccio Decl. ¶ 2 (ECF 3-20).

Critically, Defendants do not dispute that the CBP policy, whatever it has been, has yielded a *practice* that meant that CBP allowed plasma donors to enter the United States on B-1 visas the vast majority of the time.  *Compare* Wolsing Decl. ¶ 3 (ECF 3-19) ("Prior to March 20, 2020, Mexican donors did not have any concerns or trouble crossing the border on a B1/B2 visa for

purposes of donating plasma in Arizona and California.") *with* Davies Decl. ¶ 10 (ECF 9-1) (claiming to be aware of just "some cases" in which a B-1 visa-holding plasma donor was subject to adverse action, with no elaboration).  Nor do Defendants dispute that, in reliance on CBP's longstanding practice of allowing entry to Mexican national plasma donors, CSL Behring and Grifols invested hundreds of millions of dollars opening and maintaining border centers, hiring thousands of employees and paying wages, donor payments, and taxes.  *See* Opp. at 23 (referring to the "practice on which Plaintiffs built their business model," likely meaning to refer to Employee Plaintiffs' employers CSL Behring and Grifols). Defendants cannot seriously dispute that the Plasma Ban marks an extreme change from CBP's longstanding prior practice of widely allowing entry to plasma donors on B-1 visas.

Nevertheless, Defendants argue that reliance on CBP's longstanding prior practice was not reasonable because there is "no evidence that CBP *headquarters*, which is responsible for setting CBP's policy, ever *formally* sanctioned" the entry of plasma donors on B-1 visas.  Opp. at 23 (emphases added).  That is irrelevant.  There is no rule that "headquarters" must "formally" approve an agency's decades-long practice, and it strains credulity that CBP headquarters was unaware of the agency's own decades-long practice here.  The supposed absence of headquarters' official signoff is irrelevant because Defendants have already conceded that the agency's prior policy was for CBP officers at the border to exercise discretion on a case-by-case basis.  *Id.*[1]

---

[1] The evidence shows that this case-by-case approach originated with CBP headquarters, as Defendants have introduced a 2011 memo that offers general principles to CBP agents in dealing with B-1 visas, but implicitly leaves agents to apply those general principles to plasma donation on their own.  Davies Decl. Ex 2 (ECF 9-1).  In any event, the law is clear that departure from "*practices*" or "something short of binding precedent is enough."  *Open Society Institute v. USCIS*, No. CV 19-3620 (RDM), 2021 WL 4243403, at *19 (D.D.C. Sept. 17, 2021) (italics in original) (citing *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020)) (holding that the U.S. Environmental Protection Agency failed to provide a reasoned explanation when it reversed its "long allowed" practice of permitting grant recipients to serve on scientific advisory committees).

According to the Defendants, prior to issuance of the Plasma Ban, CBP officers at the border "exercised some discretion" over whether plasma donors could enter this country on B-1 visas. *See Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 80–81 (2d Cir. 2006).  But that exercise of discretion yielded a practice of near universal admission.  Thus, the Plasma Ban replaced that highly permissive, discretionary approach (which yielded a practice of admission) with a non-discretionary "per se" ban.  *Id.*  This is "an evident change in course," and the agency's failure to explain it renders the Plasma Ban arbitrary and capricious.  *Id.*; *see Spitzer Great Lakes, Co. v. U.S. E.P.A.*, 173 F.3d 412, 416 (6th Cir. 1999) ("EPA has not sufficiently justified its departure in this case from its practice of granting waivers in such circumstances."); *Puerto Rico Sun Oil Co. v. U.S. E.P.A.*, 8 F.3d 73, 78 (1st Cir. 1993) ("departure from prior norms" must be explained).

Defendants' reliance on *Fogo de Chao v. DHS*, 769 F.3d 1127, 1144 (D.C. Cir. 2014), is misplaced.  Opp. at 23.  As Defendants acknowledge, that case makes the basic point that "'[t]he mere fact that the agency, *by mistake or oversight*, approved' a visa petition *on one occasion* does not create an automatic entitlement to the approval of a subsequent petition."  Opp. at 23 (emphases added).  This cherrypicked quotation is inapposite on its own terms, because CBP officers at ports of entry along the southern border allowed many thousands of Mexican national plasma donors to enter this country on B-1 visas over a period of multiple decades—nothing like a "mistake or oversight" that happened "on one occasion."  Indeed, the very next sentence in *Fogo de Chao* confirms this key distinction: "Yet it may be that a pattern of visa grants of sufficient magnitude

_____

Defendants do not assert that CBP headquarters was unaware of the longstanding practice at the border when the 2011 memo was issued, Davies Decl. ¶ 10 (ECF 9-1), and any such assertion would be implausible given that the U.S. government as a whole has long been specifically aware of the practice of allowing Mexican nationals to donate plasma.  *See* Andrew Pollack, *Is Money Tainting the Plasma Supply?*, N.Y. Times (Dec. 5, 2009) (quoting an FDA official as referring to the practice of collecting plasma donations from Mexican visitors as "legal ethical and safe").

could obligate the agency to provide a reasoned explanation for treating similar situations differently." 769 F.3d at 1144. The record before this Court clearly demonstrates a "pattern … of sufficient magnitude"; the admissions were not one-off "mistake[s] or oversight[s]," but part of a consistent practice, including more recently a collaborative relationship between CBP and plaintiffs. *Fogo De Chao*, 769 F.3d at 1144. For example, during the shutdown of the U.S.-Mexico border resulting from the COVID-19 pandemic, CBP officials expressly allowed B-1 visa holders who intended to donate plasma to enter the United States, despite banning entry by other B-1 visa holders. Mercado Decl. ¶¶ 5-7 (ECF 3-16); Sanchez Decl. ¶ 7 (ECF 3-18).

The fact that CBP officers at the San Luis, Arizona port of entry occasionally denied entry to plasma donors does not diminish the longstanding practice. In *Fogo De Chao*, the D.C. Circuit suggested that U.S. Citizen and Immigration Services' (USCIS) granting of 251 L-1B visas to Brazilian-trained *churrasqueiro*s over a 10-year period could constitute a "pattern of … sufficient magnitude," despite the fact that USCIS also rejected 40 applications over that period. 769 F.3d at 1144. The longstanding pattern is even clearer here. CBP allowed many thousands of plasma donors to enter on B-1 visas over the past 30-plus years, including through San Luis.

CBP "gave little explanation for its decision to abandon its decades-old practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016). In fact, in the statement quoted in the press— the only public notice of the Plasma Ban—there was none. CBP now argues that a single sentence in a formerly non-public memo—only first revealed in the prior litigation brought by CSL and Grifols—is a sufficient explanation. Opp. at 24. The sentence reads, in full: "CBP understands the role of the plasma donation business in cross border commerce specifically along the U.S/Mexico border." Davies Decl. Ex. 1 (ECF 9-1). But that is no explanation at all. Moreover, this single sentence does not even acknowledge that CBP is changing its policy, much less explain the reason for the change. As Defendants candidly concede, the "purpose" of requiring federal agencies to

19

explain their policy changes "is to ensure the agency's prior policies and standards are being deliberately changed, not casually ignored." Opp. at 24 (quoting *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009). To comply with this settled standard "necessarily requires the agency to acknowledge and provide an adequate explanation for its departure." *Dillmon*, 588 F.3d at 1089. CBP here did neither.

### E.    The Plasma Ban Required Notice-and-Comment Rulemaking

A "rule is legislative if it … effects a substantive change in existing law or policy." Opp. at 26 (quoting *Mendoza*, 754 F.3d at 1021). Defendants' success on this score thus rises or falls with the arbitrary-and-capricious issue discussed above: either the Plasma Ban effected a change to CBP practice and so is arbitrary and capricious and requires notice-and-comment, or it didn't and doesn't. *See* Opp. at 26 ("As a starting point, *for all the reasons explained above*, the Guidance does not alter or amend any prior rule." (emphasis added)). As established, it is undeniable that the Plasma Ban has "substantially change[d] the experience of" cross-border plasma donors "and is therefore not merely interpretative." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011). If the Plasma Ban does not require notice and comment, "it is difficult to imagine what regulations *would* require notice and comment procedures." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).

The D.C. Circuit's decision in *Electronic Privacy Information Center (EPIC) v. U.S. Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011), is instructive. That case involved the Transportation Security Administration's decision to use a new kind of scanner for airline passengers that could generate a naked image. *Id.* The court of appeals analyzed the effect of the agency decision on passengers, concluding that its "substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." *Id.* at 5-6. *EPIC* makes clear that the relevant inquiry is the effect of the Plasma Ban on parties like the Plaintiffs.

20

As Plaintiffs' uncontroverted evidence regarding the economic impact of the Plasma Ban shows, CBP's rash decision has had "grave" effects—economic effects for donors and employees, and health effects for patients.

## III.    THE EQUITIES AND PUBLIC INTEREST SUPPORT INJUNCTIVE RELIEF

A preliminary injunction is warranted to prevent harm that is "actual and not theoretical," and that is "beyond remediation." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). Absent this Court's intervention, the Plasma Ban will cause such irreparable harm in three ways: (1) patients will suffer due to diminished access to plasma-based therapies, (2) Plaintiffs will suffer unrecoverable economic losses, and (3) all Plaintiffs and impacted patients will have been denied their right to provide comment on the Plasma Ban before it became effective.

### A.    Plaintiffs Face Irreparable Harm

Defendants do not dispute that the current plasma shortage is dire and that Employee, Donor, and Patient Plaintiffs face irreparable harm if it continues. It is not disputed that, should the Plasma Ban continue thousands of donors and plasma-industry employees in the border region— including Plaintiffs—face the prospect of severe economic hardship. Nor is it disputed that thousands of patients reliant on plasma therapies—including Plaintiffs—will face shortages of their life-saving medicines.

In the face of these imminent and irreparable harms, Defendants insist that it is CSL Behring's and Grifols' responsibility to clean up the mess that their new policy has created, speculating—without any evidence—that the "shortage *might well* dissipate if the plasma centers were willing to offer greater compensation to U.S. donors." Opp. at 29 (emphasis added). In fact, however, Grifols "has more than doubled its donor fees throughout the United States in the last two years," yet has "still suffered a decrease in plasma collections by more than 20%." Procaccio Reply Decl. ¶ 5. And even if CSL Behring and Grifols could draw *some* more American donors

by increasing payments, as explained above, the border communities in which Plaintiffs built their centers do not have sufficient U.S. population to be independently viable without donations from Mexican donors, meaning "[n]o amount of increase in donor fees or change in marketing strategy will be able to replace this Mexican population in these centers." *Id.* ¶ 4. As a result, if the Plasma Ban is allowed to stand, CSL Behring and Grifols will have to build *new* donation centers in other parts of the country to try to make up the shortfall—a process that would take many years. Such an action would not remedy the harms to Employee and Donor Plaintiffs, who would lose their livelihoods. Nor would it help Patient Plaintiffs, as increased shortages would be likely in the meantime.

Defendants also do not dispute that Employee and Donor Plaintiffs face *unrecoverable* economic losses. Instead, Defendants fault Plaintiffs for not providing any "indication of how long the plasma centers could continue to operate at their current status—and how long they could do so if they decided to increase compensation to donors to make up for allegedly diminished plasma supply." Opp. at 30. But, of course, the plasma centers have *already* been forced to cut back hours, causing ongoing economic harms to Employee and Donor Plaintiffs.. *See* Pls. Mem. at 32. Should these harms continue, these Plaintiffs have demonstrated harms that "will be 'certain,' 'great,' and 'actual.'" *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020) (internal quotation marks omitted). For example, each of the Employee Plaintiffs testified that absent income from the centers, he or she may lose their personal residence and may go homeless. *See Christian Coalition of America*, 160 F.Supp.2d at 31–32 (irreparable harm where eviction was contemplated). Each have testified that, absent this income they do not know how they would support their families. *See American Federation of Government Employees, AFL–CIO*, 104 F.Supp.2d at 76 (PI issued to when "sole wage earner" was threatened with termination). And each has testified that they do not know where they would find new

employment to replace this lost income.  These harms would be sufficient to satisfy the requirement of irreparable harm even if the sovereign immunity were waived.

Defendants also do not dispute that if Plaintiffs have a procedural right "to receive notice of, and comment on," CBP's new policy (which they do), then the violation of that procedural right constitutes irreparable harm. Opp. at 28-29 (arguing only that Plaintiffs "*had* no procedural right").  If the Court concludes that the APA required notice-and-comment rulemaking for the Plasma Ban, then Defendants concede that Plaintiffs have also established irreparable harm.

### B.    The Balance of the Equities and Public Interest Favor an Injunction

Plaintiffs' opening brief shows that the balance of equities and the public interest strongly support entry of a preliminary injunction to preserve the status quo during this litigation and to stave off the worst effects of the plasma shortage on vulnerable patients.  *See* Pls.' Mem. at 35-36 (ECF 7-1).  Defendants do not contest that there is "a robust public interest in safeguarding access to health care," *Texas Children's Hosp.*, 76 F. Supp. 3d at 246, "in … patients obtaining needed medications in a timely manner," *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 230 (D.D.C. 2012), and in "promoting industry incentives to research and develop new drug treatments." *Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109, 124 (D.D.C. 2007).  Nor do Defendants dispute that "there is a substantial public interest in having [the government] abide by the federal laws that govern their operations," including "the rule-making processes in the APA."  *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 395 (M.D.N.C. 2019) (cleaned up).  And there is no dispute that maintaining U.S. plasma supply is an important national interest.  *See* Compl. ¶ 38.

Instead, Defendants attempt to offer their own competing interests.  To start, they say that temporarily pausing CBP's new policy with respect to plasma donors *might* have some effect on other B-1 visa policies more generally.  *See* Opp. at 30-31.  But Defendants do not explain how or why, or even what policies might be affected.  *See id.*  Defendants complain that the public interest

would be harmed if the Court enters an order that "would generally permit purely domestic commercial activities under the framework of a B1 visa," *id.* at 31, and Defendants' declarant speculates that "revising the types of activities that fall within the ambit of a permissible B-1 visa purpose could significantly impact CBP's administration of the B-1 classification more generally." Davies Decl. ¶ 19 (ECF 9-1).  But Plaintiffs have not asked the Court to adopt any such revision, nor would one be justified on these facts.  Rather, Plaintiffs have asked the Court to enjoin the one unlawful policy at issue in this lawsuit: the Plasma Ban.  Defendants' declarant also mentions the trucking industry (without any substantive explanation) and expresses concern that the Court's order "could have significant implications for whether B-1 visa holders may be admitted to engage in sales of other items, even ones of a non-medical nature." *Id.*  But again, he does not explain how a preliminary injunction against this *one unlawful policy* could have such an effect.

Finally, Defendants again assert that the plasma companies bear the blame for the plasma shortage.  That is wrong for all the reasons already stated.  *See supra* pp 3-8.  It is CBP's unlawful policy that is preventing thousands of desperately needed plasma donations and contributing to an already dire shortage.  The equities and the public interest strongly favor the entry of an injunction to protect patients, and to protect Plaintiffs' reliance interests and vindicate their procedural rights.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction barring Defendants from implementing or enforcing the Plasma Ban pending resolution of this case.

DATED: February 15, 2022

Respectfully submitted,

*/s/ Baruch Weiss*
Baruch Weiss (D.C. Bar No. 388977)
R. Stanton Jones (D.C. Bar No. 987088)
Pari R. Mody (D.C. Bar No. 1032210)
Stephen K. Wirth (D.C. Bar No. 1034038)
John Swanson (D.C. Bar No. 1708630)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
Tel.: (202) 942-5000
Fax: (202) 942-5999

*Attorneys for Plaintiffs*